CHARLES R. LINDSAY, JR., *et al.* Defendants in Error, *vs.* ELIZABETH LINDSAY *et al.* Plaintiffs in Error.

*Opinion filed February 20, 1913.*

1. CONSTITUTIONAL LAW—*Juvenile Court act is not invalid as creating a new court unauthorized by constitution.* The Juvenile Court act gives circuit and county courts concurrent jurisdiction of cases arising under it, and while it provides that the court exercising the powers and jurisdiction conferred may for the sake of convenience be called the juvenile court, it does not create a new court unauthorized by the constitution but delegates powers to constitutional courts already existing.

2. SAME—*provision of Juvenile Court act for jury of six is not invalid.* Section 2 of the Juvenile Court act, which authorizes a trial by a jury of six upon the demand of any person interested or by order of the judge on his own motion, is not unconstitutional, upon the alleged ground that it deprives the child of his liberty without such a trial by jury as is guaranteed by the constitution. (*Petition of Ferrier,* 103 Ill. 367, and *County of McLean* v. *Humphreys,* 104 id. 378, followed.)

3. SAME—*legislature had power to pass the Juvenile Court act.* The act of 1899, known as the Juvenile Court act, is a proper exercise of the power of the legislature to provide for the protection of dependent, neglected or delinquent children, and is not unconstitutional.

4. JUVENILE COURTS—*purpose of the Juvenile Court act.* The purpose of the act of 1899, known as the Juvenile Court act, is to protect unfortunate children who, by reason of their own conduct, evil tendencies or improper environment, have shown that the best interests of society, the welfare of the State and their own good demand that the guardianship of the State be substituted for that of natural parents.

5. SAME—*right of parents to the custody of children cannot be violated upon slight pretext.* The right of parents to the society and custody of their children is inherent, and while the Juvenile Court act should receive a liberal construction in furtherance of the legitimate object thereof, it should not be held to extend to cases where there is no substantial ground for interference by the court to protect the best interests of the child.

6. SAME—*what is necessary to authorize action by the juvenile court.* To authorize an exercise by the juvenile court of its power to take a child from the custody of its parent there must be evidence of neglect, abandonment, incapacity or cruelty on the part of

the parent or that the child itself is delinquent or is being exposed to immorality and vice, and the mere fact that the parent is misguided in her religious views and mistaken as to the best method of educating and training the child is not sufficient.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. MERRITT W. PINCKNEY, Judge, presiding.

JAMES R. WARD, for plaintiffs in error.

McEWEN, WEISSENBACH, SHRIMSKI & MELOAN, for defendants in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is a writ of error and was sued out in the name of Elizabeth Lindsay, William Lindsay and Otoman Zar-Adusht Hanish to review a decree entered by a judge of the circuit court of Cook county sitting in the branch known as the juvenile court. Defendants in error filed a plea denying the right of all of plaintiffs in error to the writ and an issue of law was raised by a demurrer to said plea. At the last October term an opinion was filed holding that Elizabeth Lindsay was not entitled to the writ or to join in the assignment of errors but that the other two plaintiffs in error had a right to sue out the writ and have the decree reviewed. (*Lindsay* v. *Lindsay,* 255 Ill. 442.) Defendants in error have now joined in error and filed briefs on the merits of the case.

In the former opinion appears the following statement of the case:

"On December 15, 1911, defendant in error Charles R. Lindsay, Jr., filed in the juvenile branch of the circuit court of Cook county a petition charging that William Lindsay, a male child under seventeen years of age, was a dependent child and did not have proper parental care; that his father was dead and he was in the care of his mother, Elizabeth Lindsay, and Otoman Zar-Adusht Hanish; that

his mother had neglected and failed to properly care for the said child, and that she was an improper guardian and wholly unable to care for, protect, train and educate said child, by reason whereof he had become a dependent child. Summons was issued against the plaintiffs in error Elizabeth Lindsay and Hanish commanding them to appear before said court on the 4th day of January, 1912, and to have the said William Lindsay in open court. On the same day the petition was filed, December 15, 1911, the petitioner filed his affidavit stating that in his belief service of summons would be ineffectual to secure the presence of said child in court and that he should be taken into custody forthwith, 'as his immediate health and welfare are being jeopardized by his present care and custody.' 'A warrant was issued, and under and by virtue of it the boy was taken by officers to the Detention Home, where he was placed in confinement. Upon assurance being given that he would be brought into court at the time set for hearing, the boy was released and turned over to his mother and with her went to the home of a Miss Brauchmann, where they were staying at the time, and remained there until the 27th or 28th of December, when they disappeared. On the day of the hearing, January 4, 1912, Hanish filed an answer to the petition, stating under oath that he never had control or custody of said child or power to produce him in court, and had no knowledge of the place where the child was or in whose custody or control he might be. The court appointed an attorney to represent the child, and in the absence of Mrs. Lindsay and child proceeded to hear the testimony of witnesses upon the question whether or not the child was dependent or had proper parental care, and also as to the circumstances relating to the disappearance of Mrs. Lindsay and her boy. On January 24 the court entered a decree defaulting Mrs. Lindsay and William Lindsay, and finding that said William Lindsay was a neglected and dependent child, having no guardian of his person other

than his mother, his natural guardian; that the father of said child died in Philadelphia in November, 1902, leaving an estate to his said son from which an income amounting to $1200 or $1500 per year is paid to his mother, to be expended in his care, maintenance and education, by the Girard Trust Company of Philadelphia, guardian of the estate of said child; that Mrs. Lindsay was not a proper person to have the care and custody of said child and that he does not receive proper parental care. The decree further found that Hanish was the head of a religious organization to promote the Mazdaznan religion; that the said religion purports to be the teaching of oriental philosophy and religion; that Mrs. Lindsay was a believer in said religion and its teachings and recognized absolute spiritual and temporal power by Hanish over her religious beliefs, amounting to a religious fanaticism; that for a year last past she had been at divers places attending functions of said religion, had not kept the boy in school and had permitted him to reside and travel with said Hanish at different places in and through the United States and Canada, and that Hanish was not a proper person to have control over said child. The court appointed the petitioner and Ellwood C. Lindsay, of Philadelphia, Pa., guardians of William Lindsay, and authorized them to take him into their care and custody wherever he may be found, and to present to the proper court of Philadelphia a showing regarding the conditions surrounding said child when they shall have secured his custody, 'and abide by the orders of said court as to such care and custody.' The court adjudged Mrs. Lindsay in contempt of court for taking her child and leaving the jurisdiction of said court. To review this judgment a writ of error has been sued out of this court by Hanish and Mrs. Lindsay, and William Lindsay by his next friend."

The residence of the child, William Lindsay, was with his mother, in Pennsylvania or New York. It is not clear

in which of those States they resided, but it is not disputed that they were not residents of this State but were in the State on a visit, or temporarily, when the proceeding was instituted in the juvenile branch of the circuit court.

Plaintiffs in error contend (1) that the act known as the Juvenile Court act is in 'violation of the Federal constitution and the constitution of this State; (2) that William Lindsay and his mother being residents of another State, temporarily stopping in this State, were not subject to the jurisdiction of the court in a proceeding under the Juvenile Court act; and (3) that William Lindsay was not a dependent, neglected or delinquent child and his mother an unfit person to have custody and control of him.

The principal grounds urged against the validity of the act are: (1) It creates a new court, termed the "juvenile court;" (2) it denies the constitutional right of trial by jury; (3) it reduces the child to a state of involuntary servitude in cases other than as a punishment for crime; and (4) it deprives children and the parents of children of liberty, property and the right to the pursuit of happiness without due process of law. Particular objections made to specific sections of the act are unnecessary to a decision of this case and will therefore receive no discussion.

We entertain no doubt of the constitutional power of the legislature to pass an act of the character here involved, for the protection of dependent, neglected or delinquent children. Acts in many respects similar, in principle, for the protection of delinquent, neglected and dependent children have existed in some States for years, but acts like the one here being considered are of comparatively recent origin. This act was originally adopted in 1899, and is said by the editor of the eleventh and latest edition of Wharton's Criminal Law to be the first juvenile court act, as such acts are now generally known, adopted by any State. Similar acts have since been adopted by several other States and have been uniformly sustained as valid

legislation, except in the State of Michigan, where the acts held invalid were subject to objections not found in our statute. Our statute and those of a similar character treat children coming within their provisions as wards of the State to be protected rather than as criminals to be punished, and their purpose is to save them from the possible effects of delinquency and neglect liable to result in their leading a criminal career. The purpose of such legislation is, we think, rightfully claimed to be unquestionably in advance of previous legislation dealing with children as criminals.

Our statute does not, as contended, create a new court unauthorized by the constitution. The decree which this writ of error is sued out to review was rendered by a judge of the circuit court of Cook county designated by the other judges of said court, pursuant to authority conferred by the act, to hear causes arising under said act. The judge so sitting is a circuit judge and the court in which the proceedings were held is a circuit court. The legislature of Pennsylvania passed an act defining the powers of the several courts of Quarter Sessions of the Peace with reference to the care, treatment and control of dependent, neglected, incorrigible and delinquent children under the age of sixteen years. The validity of the act came before the Supreme Court of that State, and one of the objections urged to it was that it provided for an unconstitutional tribunal. The Supreme Court said the act did not create a new court; that the court of quarter sessions was a constitutional court, and the legislature, recognizing it as an appropriate one upon which to confer jurisdiction in the care of neglected and unfortunate children recognized by the State as its wards and requiring its protection, had the constitutional power to confer such jurisdiction upon that court. (*Commonwealth* v. *Fisher*, 213 Pa. St. 48; 5 Am. & Eng. Ann. Cas. 92.) Our statute gives circuit and county courts concurrent jurisdiction in cases arising under it, and while it

provides that the court exercising the powers and juris-
diction conferred by the act may for convenience sake be
called juvenile court, it does not create a new court but
delegates powers to constitutional courts already existing.
The prerogative of the State arising out of its power and
duty, as *parens patriæ,* to protect the interests of infants
has always been exercised by courts of chancery. In *Wel-
lesley* v. *Wellesley,* 2 Bligh, (N. S.) 142, Lord Beresford
said the right of a chancellor to exercise such powers had
not been questioned in one hundred and fifty years. This
jurisdiction is by the Juvenile Court act conferred upon
juvenile courts. *Witter* v. *County Comrs.* 256 Ill. 616.

Section 2 of the act under consideration authorizes a
trial by a jury of six upon the demand of any person in-
terested, or the judge may of his own motion order a jury
of the same number to try the case. This, it is claimed, is
not such a jury as the constitution guarantees. This con-
tention of plaintiffs in error, and also the contention that
the act deprives the child of his right to personal liberty,
were decided contrary to the position of plaintiffs in error
in *Petition of Ferrier,* 103 Ill. 367, and *County of McLean*
v. *Humphreys,* 104 id. 378. In the *Ferrier case* Winifred
Breen, a girl nine years old, was found to be a truant from
school, without proper parental care and in imminent dan-
ger of ruin and harm. In a proceeding in the county court
under "An act to aid industrial schools for girls," passed
in 1879, she was committed to an industrial school for girls
at Evanston and one of the vice-presidents of the school
was appointed her guardian, in accordance with the provi-
sions of the act. That act authorized a trial by a jury of
six. It was contended in this court that the act violated
the constitutional provision that no person should be de-
prived of liberty without due process of law. This court
held that the jurisdiction conferred by the act upon the
county court was the same character of jurisdiction exer-
cised by courts of chancery over the persons and property

of infants, having its foundation in the prerogative of the State flowing from its general power and duty, as *parens patriæ,* to protect those who have no other lawful protector. The court said: "The right to liberty which is guaranteed is not that of entire unrestrainedness of action. Civil government in itself implies an abridgment of natural liberty. 'Civil liberty, which is that of a member of society, is no other than natural liberty, so far restrained by human laws, and no farther, as is necessary and expedient for the general welfare.' (1 Blackstone's Com. 125.) It is not natural but civil liberty of which a person may not be deprived without due process of law. There are restrictions imposed upon personal liberty which spring from the helpless or dependent condition of individuals in the various relations of life, among them being those of parent and child, guardian and ward, teacher and scholar. There are well recognized powers of control in each of these relations over the actions of the child, ward or scholar, which may be exercised. These are legal and just restraints upon personal liberty which the welfare of society demands, and which, where there is no abuse, entirely consist with the constitutional guaranty of liberty. (See Cooley's Const. Lim. 339, 342.) We find here no more than such proper restraint which the child's welfare and the good of the community manifestly require and which rightly pertains to the relations above named, and find no such invasion of the right to personal liberty as requires us to pronounce this statute to be unconstitutional." On the trial of the case before the county court a jury of twelve men was demanded and was denied. The statute, as we have said, provided for trial by a jury of six. Upon this question the court said: "The constitutional provision that 'the right of trial by jury, as heretofore enjoyed, shall remain inviolate,' does not apply. This is not a proceeding according to the course of the common law in which the right of a trial by jury is guaranteed, but the proceeding is a statutory one, and the statute, too,

enacted since the adoption of the constitution. There was not, at the time of such adoption, the enjoyment of a jury trial in such a case. In reference to this subject, generally, Judge Cooley, in his work on Constitutional Limitations, (page 319,) remarks: 'But in those cases which formerly were not triable by jury, if the legislature provide for such a trial now, they may doubtless create for the purpose a statutory tribunal composed of any number of persons, and no question of constitutional power or right could arise.' "

*County of McLean* v. *Humphreys, supra,* arose under the same act of 1879 and its validity was again attacked in this court. The court said: "It would be difficult to conceive of a class of persons that more imperatively demands the interposition of the State in their behalf than those we have just enumerated and for whose benefit the act under consideration was adopted, and it would be a sad commentary on our State government if it is true, as is contended, there is no constitutional power in the legislature to provide, by suitable legislation, for their education, control and protection. It is the unquestioned right and imperative duty of every enlightened government, in its character of *parens patriæ,* to protect and provide for the comfort and well being of such of its citizens as by reason of infancy, defective understanding, or other misfortune or infirmity, are unable to take care of themselves. The performance of this duty is justly regarded as one of the most important of governmental functions, and all constitutional limitations must be so understood and construed as not to interfere with its proper and legitimate exercise. We perceive no force in the objection that the act in question is an infringement upon the personal liberty of the citizen, as guaranteed by the constitution. The restraints which the act imposes are only such as are essential to the comfort and well being of the unfortunate class of persons who are brought within its provisions. All governmental and parental care necessarily imposes more or less wholesome re-

straint, and we see nothing in the act which looks beyond this. Assuming, then, as we do, the legislature has the right to provide for the education, support and control of these unfortunate beings, it clearly has the right also to provide the necessary instrumentalities or agencies for the accomplishment of these objects."

We have quoted extensively from those two cases because the principles involved in them are similar to those involved in this case, and we think they answer the objections here made to the Juvenile Court act.

Since 1899 several States have passed acts known as juvenile court acts. In Pennsylvania, Florida, Utah and Idaho the validity of such acts has been passed upon and sustained by the Supreme Courts of those States. (*Commonwealth* v. *Fisher, supra; Pugh* v. *Bowden,* 54 Fla. 302; 14 Am. & Eng. Ann. Cas. 816; *Mills* v. *Brown,* 31 Utah, 473; 120 Am. St. Rep. 935; *In re Sharp,* 15 Idaho, 120; 18 L. R. A. [N. S.] 886.) Acts of other States not known as juvenile court acts but authorizing the State to take the custody of neglected, abandoned and delinquent children and commit them to institutions established and maintained for their care, and authorizing them to be placed in good homes to be selected by those to whose custody they were committed, have been frequently before the courts and have almost uniformly been sustained. Some of the cases are: *Whalen* v. *Olmstead,* 61 Conn. 263; 15 L. R. A. 593; *State* v. *Kilvington,* 100 Tenn. 227; 41 L. R. A. 284; *State* v. *Brown,* (Minn.) 16 L. R. A. 691; *Board of Children's Guardians of Marion County* v. *Shutter,* 139 Ind. 268; 31 L. R. A. 740; *Jarrad* v. *State,* (Ind.) 17 N. E. Rep. 912; *In re Kelly,* (Mass.) 25 N. E. Rep. 615; *Farnham* v. *Pierce,* 141 Mass. 203; 55 Am. Rep. 452. See, also, chapter on juvenile courts in the eleventh edition of Wharton's Criminal Law.

It is further contended the evidence does not sustain the finding of the decree that William W. Lindsay was a

dependent child. The petition filed in this case alleged that William W. Lindsay was a dependent child in that he did not have proper parental care. It is further alleged that his father was dead and he was in the custody or control of his mother, Elizabeth Lindsay, and Hanish; that his mother had wholly neglected and failed to properly care for him; that she was an improper guardian and wholly unable to care for, protect, train and educate said child, by reason of which he had become dependent. Defendants in error do not contend that there is anything in the character or disposition of the boy that would make him amenable to the laws respecting delinquent children. The evidence shows that he is a modest, unassuming boy, twelve years of age, without any bad habits and no apparent evil tendencies, devoted to his mother and obedient to her wishes. His father died when he was three years of age, and since that time he has been under his mother's care and has lived with her. He receives an income of from $1200 to $1500 per year from his father's estate, which is under the management of the Girard Trust Company of Philadelphia, the income being paid to Mrs. Lindsay for the boy's support and maintenance. Mrs. Lindsay and her boy have lived in various places since the death of the boy's father and have traveled to some extent abroad. In 1910, while residing in New York City, Mrs. Lindsay became a follower of Otoman Zar-Adusht Hanish and a member of the religious organization of which he was the leader. This organization maintains temples or places of worship in Los Angeles, New York City, Chicago, Lowell, Montreal, and in some foreign countries, and purports to teach what is called the Mazdaznan religion. It is the connection of Mrs. Lindsay with this religious society and the association of the boy with Hanish that afford basis for the allegation in the petition that she is an improper guardian of her boy. The evidence shows that while Mrs. Lindsay lived in New York City, and about six months after she became a member

of the Mazdaznan religious society, Hanish stayed at her home about ten days. At the same time a Mrs. Hilton and daughters were residing with Mrs. Lindsay. Later Hanish spent three weeks at the home of Mrs. Lindsay, and during that time Miss Brauchmann and Mr. Hesbie were staying there also. The boy went on one occasion from New York City to Montreal to see Hanish, staying, while there, with a Mr. Malley, a member of the society, and from there went to Lowell, Mass., to attend services at the temple. In 1911, while Hanish was in California, the boy was sent to him, traveling alone. Together they visited San Diego, Los Angeles, San Francisco, Seattle, Salt Lake City, Portland, and then returned to Chicago. On part of the return journey they were accompanied by Maurice Clemens, a young man employed by Hanish in connection with his temple services. While on this trip, which occupied about seven weeks, Hanish and the boy sometimes occupied the same room and also slept together. The boy took no part in the services at the temple and was not employed by Hanish. On his travels over the country his expenses were paid by his mother. The evidence shows that Mrs. Lindsay attended the services at different times at the temples in Lowell, Montreal and New York City, and was on a visit to Chicago for that purpose when the petition was filed in this case. She appears to be a woman of culture and refinement and of more than ordinary intelligence. There is evidence showing that she has great faith in Hanish as the head of the Mazdaznan religion and is a firm believer in the doctrines taught by him, but aside from that there is no evidence that she is in any way an unfit or improper person to have the care and custody of her boy. She seems to be deeply attached to him and very solicitous in regard to his health and welfare. She may have been misguided in her religious views and mistaken as to the best method of educating and training her boy, but we search the record in vain for evidence that he lacked food, clothing or

shelter or was being reared in immoral or indecent surroundings. Defendants in error introduced in evidence a book written and published under the supervision of Hanish, called "Inner Studies,"—a philosophical and medical treatise on health and hygiene and the treatment of disease according to the tenets of the Mazdaznan religion, which, it is claimed, shows that its author is a man of perverted character and morally unfit to associate with a boy of the age of William W. Lindsay. A copy of this book was found in the room occupied by Mrs. Lindsay at the home of her sister, in New York City, about a year after she had used the room, but it is not shown that either Mrs. Lindsay or the boy had ever seen or read the book. The book certainly cannot be commended for perusal by anyone, but in the absence of evidence that its principles were being taught to the boy or that he had access to it, we would not be justified in concluding that association with its author would show such a lack of parental care as to make the boy dependent, within the meaning of this statute. There is no proof in the record that the Mazdaznan religion is an immoral religion or that Hanish himself is an immoral man or engaged in immoral practices. Nor is there any proof that in his relations with the boy or the boy's mother he was guilty of any conduct that rendered him an unfit associate.

The purpose of this statute is to extend a protecting hand to unfortunate boys and girls who, by reason of their own conduct, evil tendencies or improper environment, have proven that the best interests of society, the welfare of the State and their own good demand that the guardianship of the State be substituted for that of natural parents. To accomplish that purpose the statute should be given a broad and liberal construction, but it should not be held to extend to cases where there is merely a difference of opinion as to the best course to pursue in rearing a child. There should be evidence of neglect, abandonment, incapacity or cruelty

on the part of the parent or that the child is being exposed to immorality and vice. The right of parents to the society of their offspring is inherent, and courts should not violate that right upon slight pretext nor unless it is clearly for the best interests of the child to do so. We do not so find the evidence in this case, and for that reason the decree of the circuit court is reversed.           *Decree reversed.*