## The People of the State of Illinois ex rel. Le Roy Philip Kuhn, Defendant in Error, v. Ada Weeks, Plaintiff in Error.

### Gen. No. 27,511.

Parent and child—*right of father to custody of child dependent upon interest of child.* A father of a motherless fifteen-year-old girl is not absolutely entitled to the custody of such child under Cahill's Ill. St. ch. 64, sec. 64, sec. 4, and in a habeas corpus proceeding by him for the custody of such child, an aunt of the child is entitled to her custody as against him where the evidence shows that both the father and the aunt are well able to take care of the child financially and to provide for her material welfare and that both parties are cultivated and morally fit persons but that the aunt has had the child's custody, at the father's request, from her infancy, and has supported, maintained and fully provided for her, and that the child prefers to remain with the aunt; that the father has remarried and has another family and during a part of the time has not contributed materially to the child's support or provided her with toys or playthings or visited her frequently and that the child's best interests will be subserved by keeping her in the aunt's charge and custody.

O'Connor, J., dissenting.

Error by defendant to the Circuit Court of Cook county; the Hon. Phillip L. Sullivan, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1922. Reversed and remanded with directions. Opinion filed March 1, 1923.

OGDEN & TRAXLER, for plaintiff in error.

WETTEN, PEGLER & DALE, for defendant in error.

MR. JUSTICE TAYLOR delivered the opinion of the court.

On December 3, 1920, the relator, LeRoy Philip Kuhn, filed a petition for a writ of habeas corpus that his sister, Ada Weeks, be ordered to give to him possession of his daughter, Kathryn Margaret Kuhn, who was at that time twelve years of age.

To the writ which was issued on December 3, 1920, the respondent, Ada Weeks, on December 11, 1920, filed an answer, and asked that the writ be quashed and the petition dismissed. The cause was continued from time to time and, finally, on November 1, 1921, the court found that Kathyrn Margaret Kuhn was unlawfully detained by Ada Weeks and ought not to be remanded to her custody, and ordered that the said Kathryn be released and discharged from the custody of Ada Weeks and delivered to the petitioner, her father. The record does not show much controversy as to the material facts.

The petitioner is a surgeon by profession, and, at the time of the trial, forty-one or forty-two years of age. He practiced at Fairbury, Illinois, from December, 1905, until June, 1911, when he moved to Chicago. The last seven or eight years he has specialized in surgery. He was first married in September, 1905, and on September 14, 1908, Kathryn, the child in question and the only child of the marriage, was born at Fairbury, and on September 30, 1908, her mother died. The petitioner married again in June, 1913, and as a result of that marriage has one child, a daughter Jane, who at the time of the trial was two years old. In 1914 and 1915 his income averaged between $2,000 and $3,000 a year, and at the time of the trial was slightly above $10,000 a year. At present he is living

with his second wife, Grace Kuhn, and their daughter Jane, in a five-room apartment consisting of a bed room, sun parlor and bed-room combined, a large sitting room, dining room and kitchen. The building contains twenty-four apartments and is on Gault avenue in Chicago. One Dr. Scott, a Methodist minister, described the apartment as luxuriously furnished. He further testified that the petitioner appeared very devoted to his little daughter Jane; that he had seen Kathryn and her father together at his home.

Shortly after Kathryn was born, in Fairbury, she was taken care of for a while by a Mrs. Wormser, a washerwoman and laundress employed by the petitioner, afterwards by a Swedish girl who was employed by him as housekeeper.

One Agard, a lawyer, and in 1910 mayor of Fairbury, and who knew the petitioner and his first wife, as well as the daughter, testified that after the mother's death his family had Kathryn for a while; that he knew the petitioner well; that he (the petitioner) had a good reputation in the community but had some critics; that he was a member of the Methodist Church; that he had a good reputation as a practicing physician; that he made speeches in an antisaloon campaign and said he thought it was good business; that there was nothing against his morals. When asked if there was anything against his character, he said, "yes," defining character "as being those individual motives that actuate a man in any line of conduct."

In the summer of 1910 the petitioner came from Fairbury to Evanston and had a talk with his sister, the respondent, concerning what might be done with Kathryn. At that time respondent was teaching school. Nothing definite at that time was accomplished, but on Saturday, a week before Christmas, 1910, pursuant to a request of the respondent that the petitioner make her a visit and bring with him the child, he went to his sister in Evanston, spent a week

end and left Kathryn, for the first time, with the respondent. A temporary arrangement was made at that time by the petitioner with another brother of the petitioner concerning the care of Kathryn. The final result, after Kathryn had been there a week, was that the respondent took over Kathryn, getting a woman to help her take care of Kathryn during the day while the respondent was away. Since January 5, 1911, Kathryn has been in the charge and possession of the respondent. During the first months the petitioner sent respondent $20 a month. That amount was paid monthly from January, 1911, until February 1, 1914, and from 1914 until the time of the trial the petitioner has paid respondent on account of Kathryn about $40 a year. The petitioner visited the respondent several times in the year 1911, besides living with her from June until October of that year. He visited her about three or four times in 1912 and six or eight times in 1913. After that the petitioner visited the respondent about three times a year.

The respondent at the time of the trial was a married woman, fifty-nine years of age, and living at 1831 Chicago avenue, Evanston, Illinois. The house contained seventeen rooms, four sleeping porches, a large front porch and three small ones. Most of the rooms were occupied by roomers. The house is located on a lot which is 66 feet front and 170 feet deep; it is about a block from Lake Michigan and 130 feet from the Liberal Arts campus of the Northwestern University. It is valued at $25,000 and is incumbered for $4,500. At the time of the trial the respondent had fifteen roomers in all. Her net income from the house is about $4,000 a year. On July 26, 1913, the respondent and one LeRoy Titus Weeks, a preacher of the Episcopal Church, were married. That was two days before the petitioner married his second wife. Weeks has a parish at Emmettsburg, Iowa, where he has been for seven years. His vacations, consisting of

about eight weeks, in the summer, he spends with the respondent at her home in Evanston. At the time of the trial he was sixty-seven years old. In July, 1913, the petitioner and the respondent, at the latter's home, had a conversation concerning the future of Kathryn. The respondent testified that the petitioner said to her, "I want you to keep Kathryn. Don't think I want you to keep Kathryn all through these hard years and then take her when she is fourteen or fifteen," and that she responded, that she did not think he would do that, and then stated, "You are my brother, and I love you and I love Kathryn dearly." Further, that they both said they would always do the right thing. Various conferences occurred, in July, 1913, and February, 1914, September, 1917, and January, 1918, between the petitioner and the respondent in regard to Kathryn. Those conferences usually pertained to the condition of Kathryn, what should be done with her, what money was spent on her and what money he could himself send to the respondent for Kathryn's keep.

The respondent testified that at the conference in February, 1914, the petitioner said, "We have a home and my wife is willing to take her"; and further, "It is purely a financial matter to me and if you love her like you say you do and want to keep her there it is all right with me." At the conference in September, 1917, she says the petitioner told her he would take the child away unless she consented to four things: First, that the music teacher she, the respondent, selected should be subject to his approval. Second, that she should go to the Evanston Public School, having before gone to a private kindergarten. Third, that the clothing he bought her, she should wear. Fourth, that when he requested that she should go to his house she should go immediately and the length of her stay should be determined by him. The respondent states that she accepted those four propositions for the sake of Kathryn.

In January, 1918, the respondent wrote the petitioner, her brother, a long letter, which was evidently in answer to a letter by the petitioner, in which the respondent said:

"As you will probably have her for some fifteen years or so and I have had her two weeks over seven years would you not be so kind as to let me keep her until her school closes in June? The first reason is one for myself. As I love Kathryn so dearly it will be as hard as the death of a loved one to have her go. * * * The other reason is it will be hard on Kathryn to take her in the middle of her school year. She would lose much and spoil her fourth year of work to change in the middle in place of at the end of any year's work. Because she loves me it will tell on her for a while after taking her away. * * * Do not think for one minute I am scheming to find a way to keep her. I know she has to go sooner or later and have known it for some time. And as I have said I would do anything not wrong to keep her."

It was insisted upon by the respondent in her testimony that in her judgment the petitioner was neither fit nor competent because he had not had the child with him; that he could not understand her intellectually or spiritually or psychologically; that if she went to the petitioner her life would be blighted; that she, the respondent, could administer the necessary things, having reference to the mind and welfare of the child, better than her father.

The daughter Kathryn testified on behalf of the respondent. She stated that she was in the eighth grade at school, was living with her aunt, was very happy and loved her aunt. She further testified that she had visited her father at various times before he went to the war. When asked how he treated her she answered, "Well I have been treated like a human being." She stated further that on Thanksgiving Day, 1919, her father came to her aunt's house and asked her, Kathryn, why she didn't visit him and that she

told him she had always been afraid he would take her with him, and that he answered, ''I never have intended to take you and I never have tried to take you and I never will take you.'' That the first time that her father told her he was going to take her was the evening of Thanksgiving, 1920. She further testified that her father in ten years had never given her any toys, books nor dolls; that she had never sat in her father's lap during the past ten years but once; that she is not happy when she is at her father's home and would prefer to stay with her aunt, the respondent, than go to her father's.

The statute, chapter 64, sec. 4, Cahill's Ill. St. provides that ''in case of death of either of the parents, the surviving parent, they being respectively competent to transact their own business, and fit persons, shall be entitled to the custody of the person of the minor and the direction of his education.'' The petitioner is the surviving parent of Kathryn, the mother of the child having died sixteen days after the child's birth. As said by Mr. Justice Cartwright in *Sullivan v. People,* 224 Ill. 468: ''The law charges the father with the maintenance of his child, and the legal presumption, in the absence of all proof, is that he is entitled to its care and custody. The right is not an absolute one, and it may be divested by the paramount power of the State for good and sufficient cause.''

The right, not being absolute, the question arises whether the facts here show that the child ought to be taken and given to her father. There is no question as to pecuniary fitness nor as to the sufficiency of his home as a place of residence. The father and his sister are, each, able to take proper general care of the child. In *People v. Porter,* 23 Ill. App. 196, the court said:

''In controversies of this character, three matters are to be regarded; the rights of the parent, the rights and interests of the person or persons to whom the

care and custody of the infant child has been given by the parent, and the welfare of the child; and of these three the last mentioned is the matter of primary and paramount importance. The father is prima facie entitled to the custody of his minor child, but he may forfeit the right by misconduct or voluntarily relinquish it. If he, by agreement, surrenders the custody of his child to another, such surrender is not absolute and irrevocable; but, if a contention arises in the courts with reference to such relinquishment, much will depend upon the characters and habits of the contending parties, the fact whether the reclamation is sought within a short time or after the lapse of years, and the circumstances of the particular case. All other considerations, however, will be subordinated to the interest and welfare of the child.''

In *Wohlford v. Burckhardt,* 141 Ill. App. 321, the court said:

"The court is only warranted in depriving the father of the custody of the child when the evidence discloses that the child, on his account, is destitute, abandoned or dependent, or that he is living an immoral life or in vicious or disreputable surroundings, or that he neglects or treats the child unkindly or cruelly, or may do this, or is wanting in good principles, or is illy adapted to the care of the child on account of defects in his mental or physical qualities, which prevent him from being a kind and affectionate father.''

In *Cormack v. Marshall,* 211 Ill. 519, the court said:

"The parent has the superior right to the child, but the superior right of the parent must yield to the best interest of the child. There is a recognition of both the rights, although the parent has the superior right, which is a true statement of an abstract proposition. He only has that superior right when it accords with the best interest of the child.''

In *Harmon v. Starbody,* 219 Ill. App. 603, the court said:

"That a parent has the right to the custody of his children against all the world, unless he has forfeited

that right or the welfare of the child demands that he should be deprived of it, is a fundamental principle which has been long and firmly established. The home is the foundation of society and civilization and only in an extreme and special case where the parent is unfit or unable to give the proper care to his children will the court take them from him.''

In *People v. Small*, 142 Ill. App. 422, where a mother who had divorced her husband and, subsequently, died leaving a will designating the grandmother of the child as testamentary guardian, the court held, regardless of that designation, that, considering the situation of the father, it was best to leave the child with her grandmother. The court there said: ''The best interest of the child is the paramount consideration in a case of this kind,'' and further:

''After studying the record carefully we conclude that the home of the grandparents in Mazon surrounded by these religious and educational opportunities is a better place for this young girl to live in than massage parlors on North Clark street, Chicago, in the vicinity of numerous saloons and a beer garden, in a house presided over by a hired housekeeper, and the court below did not err in leaving the custody of the child with its grandmother as the mother appointed.''

In *People v. Siems*, 198 Ill. App. 342, the court said:

''The parent has the right to the custody of his child as against the world unless he has forfeited his right, or the welfare of the child demands that he be deprived of it.''

In *Barclay v. People*, 132 Ill. App. 338, at 355, the court said:

''But the prevailing consideration should not be the respective rights of the parties; it should be, what is for the best interests of the child.''

The foregoing references have been made to illustrate the somewhat diverse views that have been expressed, from time to time, as the subject has been under consideration by our courts. It seems to be

reasonably deducible therefrom that, notwithstanding the seemingly rigorous expression of the law as it is set forth in the statute, the court may, in determining the right of a parent to the custody of his child, give greater heed to the welfare of the child than to the natural right of the parent; in other words, although the parent is morally and pecuniarily fit, if it appears reasonably certain, considering all the circumstances, that it would be better for the welfare of the child that it should remain with a third person, the parent's natural rights must give way.

In the instant case, if Kathryn is given over to her father she necessarily would be in a very different domestic atmosphere from that she now lives in. Her father at work in the day time, she would be left to the sole association of her stepmother and infant half sister. The. solicitude that her aunt now and for so many years has shown for her would be missing. For some time, at least, she would miss the presence and help of her aunt and her aunt's sincere affection. That would mean to her now, when the mind is impressionable, and in need of the steadying influence of some one she wished to please and to confide in, great loss, and, it might be, a grievous harm.

If the object of the petition were a boy, it might well be that under such circumstances he should be given to the father, who could perhaps better give him the more rigorous training and tuition necessary to his proper bringing up. But the necessities of a girl's upbringing are provided best by the ministrations of a good woman who already has the affections of her ward.

In determining this matter, we place no special emphasis on the omission of the father to furnish her with toys, or to see her oftener, or to pay more money for her living and education, or overtly to show affection for her. It may even be admitted that he possesses for her the normal parental love, still, a subtle

human status has been brought about with his assent and connivance, which, if broken, might entail great suffering and unhappiness, and even permanent injury. The fact that she affectionately favors her aunt augurs ill for her if given to her father. That probable hurt should be°prevented, if it may be lawfully done. It is not unnatural that, after ten years close living with her aunt, she should prefer her. That does not necessarily reflect upon the father. In the early years of his professional career, when his income was not large, and his daughter was in infancy, he, quite reasonably, put her in charge of his sister. That was all reasonable. And, also, what has arisen since, the greater fondness of the child for her aunt, is natural and reasonable. The law takes cognizance of that, but, now, when he seeks to take possession of her, and by so doing to cause her unnecessary pain and suffering, reason and, therefore, the law, says it ought not to be done.

It is quite true that whatever is done will cause some suffering. If given to her father, the child and her aunt suffer, though the feelings of the aunt are, in law, irrelevant. If allowed to stay where she is, the father may suffer. But, it seems to be the law that the interests and happiness and well-being of the child are paramount, and of the greatest moment, and, that being so, she ought to be left in the charge and possession of her aunt. Then, too, she will be fifteen years old in September of this year, and in three years will be an adult and able, legally, to exercise her own choice. No one, judge or layman, can accurately foresee the future, but balancing the probabilities that a careful consideration of the evidence gives rise to, we are of the opinion that the most reasonable adjudication is to leave the child where she is.

The judgment will be reversed and the cause remanded with directions that Kathryn Margaret Kuhn

be remanded to the custody of Ada Weeks, and the petition dismissed.

*Reversed and remanded with directions.*

THOMSON, P. J., concurs.

O'CONNOR, J., dissents.