(No. 34869.—

THOMAS PAUL FONTAINE GIACOPELLI *et al.*, Appellees, *vs.*
THE FLORENCE CRITTENTON HOME *et al.*, Appellants.

*Opinion filed May 22, 1959.*

KLINGBIEL, SCHAEFER, and HOUSE, JJ., concurring.

GARRETSON, LEHMANN & THORNQUIST, of Chicago, RUDOLPH P. WESTPHAL, of Peoria, (JAMES L. GARRETSON, and RUTH THORNQUIST, of counsel,) for appellants.

RONAN & CUNNINGHAM, of Chicago, for appellees.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

Nick and Helen Giacopelli, husband and wife, filed a petition for writ of *habeas corpus* in the circuit court of

Peoria County against Anthony and Doris Legaz, to secure the custody of petitioners' four-month-old son, Thomas Giacopelli. A return was filed alleging that petitioners had abandoned the child and were not fit to have its care and custody. The cause was tried by the court, which found that the welfare of the child would be best served by denying custody to petitioners. The writ was quashed, and the child was remanded to the custody of respondents. On review by the Appellate Court the order was reversed, with directions to return the child to petitioners. (*Giacopelli* v. *Florence Crittenton Home,* 16 Ill. App. 2d 445.) We have granted leave to appeal.

A determination of this cause requires a detailed analysis of the evidence adduced on the hearing in the trial court. Petitioners, Nick and Helen Giacopelli, were married March 10, 1955. At the time of the hearing in July, 1957, Nick Giacopelli was 38 years of age and Helen Giacopelli was 44 years of age. Nick Giacopelli had previously married three times, in 1943, 1944, and 1949. Each of these marriages ended in divorce, the first for the wife's fault and the other two for his fault. The second and third marriages were consummated at times when Nick Giacopelli was not yet divorced from his first wife, he not having secured a divorce from his first wife until 1950. By his third marriage he had one child who is now in the custody of the child's mother. Helen Giacopelli had been previously married once and divorced some 15 years ago. She had two children by the prior marriage. Her daughter is married and lives at Normal, Illinois, and her son is in the service. At present, petitioners are living in St. Louis, Missouri, in a 4-room apartment occupied by the mother of Nick Giacopelli.

In May, 1956, Helen Fontaine Giacopelli became aware of the fact that she was pregnant. She claimed that she then became upset and emotionally disturbed and continued in this condition during the first 4½ months of her preg-

nancy. The latter part of October she decided to visit her daughter at Normal. While driving to her daughter's home she became involved in a minor car accident. The woman driving the other car, whom she did not know, noticed her pregnancy, noticed that she was upset and, when told that she did not want to go home, suggested that she go to Florence Crittenton Home in Peoria. This home is a charitable organization providing a haven for unwed mothers. Pursuant to this suggestion she admits that she went to the Crittenton Home and there discussed her situation with Claire Austin, a trained social worker and executive director of the home. There are serious discrepancies in the testimony of Helen Fontaine Giacopelli and Claire Austin at this point. The first arises as to dates. Helen Fontaine Giacopelli testified that following the car accident in the latter part of October she proceeded to her daughter's home, left her car there and took a bus back to her husband's home in St. Louis. She says that on November 5 she took a bus to Peoria and entered the Crittenton Home; that she was interviewed by Claire Austin the next day, November 6; and that she remained in the home until November 15 when she decided to leave, until closer to the time of her delivery. Claire Austin testified that Helen Fontaine Giacopelli telephoned the home a day or two prior to October 21 to inquire about the facilities and that on October 21 she entered the home for the first time. On that day she interviewed Helen Fontaine Giacopelli and prepared an intake sheet which she produced in court and which apparently bore the date of October 21. On that date, in preparation for her entrance into the home, a Wasserman and smear were taken of Helen Fontaine Giacopelli and sent to the Health Department. Report cards showing negative as to both were returned to the Crittenton Home and these cards are dated October 22. These cards were likewise produced in open court. Claire Austin further testified that Helen Fontaine Giacopelli remained in

the home until November 4, and not November 15, when she announced that she would go to her daughter's home and there wait until she was closer to the time of delivery. The record is barren of any explanation by Helen Fontaine Giacopelli of these discrepancies as to dates.

The second major discrepancy appears with reference to the interview between Helen Fontaine Giacopelli and Claire Austin upon her first entrance to Crittenton Home. On direct examination Helen Fontaine Giacopelli testified that she told Claire Austin about her emotional reactions; that Claire Austin advised her she was in the right place; that it wasn't necessary to give her right name or address and that an Illinois address would be more convenient; that she should not reveal her identity to anyone and, if asked, she was to say she was unmarried and wanted to give her baby up. She further testified that she told Claire Austin to contact a Vito Palazolla if anything happened to her and he would contact her husband. On cross-examination she said she told Claire Austin all about herself, that she had a son and daughter, that she gave her daughter's address in Normal, Illinois, as her address, although she told her she actually lived in St. Louis; that she told Claire Austin she was Catholic and her husband's name was Nick Giacopelli; that she did not name Vito Palazolla as the father of her unborn child. Helen Fontaine Giacopelli finally admitted, however, that upon entering the Crittenton Home she gave her name as Helen Fontaine and that she did not at any time change this designation. She also admitted she represented that she was an unmarried woman.

Claire Austin produced in open court the intake record sheet made up by her at the time of the interview. The material contained on it was derived from the question and answer interview with Helen Fontaine Giacopelli. Claire Austin testified that Helen Fontaine Giacopelli told her she was illegitimately pregnant; that one Vito Palazolla was

the father of the child; that they had been contemplating marriage but that she had become convinced that Vito was no longer interested; that she wanted to keep the situation from the general public because of her shame and wanted to place the baby for adoption; that she gave the name of the paternal grandmother as Rose Palazolla who lived in St. Louis; that she was of the Protestant faith—a Baptist —and had been referred to the home by a minister. Claire Austin testified that she particularly questioned her about her religion since it appeared odd to her that, with the French name of Fontaine, she would be of the Protestant faith.

Helen Fontaine Giacopelli testified that she left the Crittenton Home the forepart of November and went to her husband's home in St. Louis. She did not disclose to him the fact that she had been to the Crittenton Home or that she intended to return. She did return on January 12. The baby was born on March 2 at the Methodist Hospital in Peoria and Helen Fontaine Giacopelli gave it the name of Thomas Paul Fontaine. She returned from the hospital on March 4 and continued to stay at the home until March 23.

The evidence further shows that on March 5 Helen Fontaine Giacopelli called for Claire Austin and requested that papers for adoption be prepared so that the baby could be placed as soon as possible. Pursuant to the request, Claire Austin prepared an appearance and consent to a finding of dependency and consent to appointment of a guardian for the child with power to consent to adoption without further notice. This Helen Fontaine Giacopelli read and then signed. The instrument was filed in the juvenile division of the county court of Peoria County and a dependency decree was entered on March 8, after which the child was placed in the home of respondents. At no time after signing the appearance and consent and while remaining in the Crittenton Home did Helen Fontaine Giacopelli indicate any dissatisfaction with what she had done or with the

placement of the baby or that she had changed her mind. She made no request for the return of the baby to her.

Helen Fontaine Giacopelli left the home on March 23 and went to her daughter's home in Normal. She remained there until April 25. At no time during her stay at her daughter's home did she contact the Home to indicate a dissatisfaction with the placement of the baby or that she desired a return of the baby to her. She returned to St. Louis on April 25 and told her husband what she had done. He became hysterical and some time thereafter began an inquiry to learn of the whereabouts of the child. When this was done the *habeas corpus* proceedings in this case were commenced.

The hearing in the trial court included the testimony of Nick Giacopelli. It was revealed that he has a criminal record. He admitted to about 26 arrests, that he was convicted of intimidating a Federal witness fifteen or eighteen years ago, that he was convicted of burglary and larceny in 1942, and sentenced to six months and placed on parole for two years, committed bigamy in 1944 and 1949, had paid $1,200 in fines, the last being a $300 fine in February, 1956. He had four charges of selling coal without a sticker. It appears that he showed little concern for his wife during her pregnancy and long absence from home, "imagining" that he called her four times from November 4 to April 25, on which occasions he talked only to her daughter. He made no effort to contact her personally either by mail, telephone, or in person. Although he was aware of her pregnancy from its inception and of the fact that the baby was due in March, he indicated no concern over his wife's long absence, even though he knew she was pretty sick. He made no effort to contact her after the time when he knew the baby was expected until she returned home six weeks later. He said he was busy with his work. In fact, the record indicates a lack of interest by Nick Giacopelli in the prospective birth of his child. When he finally contacted

the Crittenton Home about his child, in response to inquiries as to the whereabouts of Helen Fontaine, he said he did not know where the mother was and did not care. It appears that Giacopelli was sick much of his life, is presently engaged in selling coal and produce, and earns $70 to $75 per week.

The respondents were investigated by Claire Austin prior to the placement of the child with them, for a two-year period. She found them to be good, decent, stable people, having an adequate home of their own, occupied only by them. They have no children. He is employed as a clerk in the Peoria post office and has been so employed for several years. She was employed as a telephone operator before this child was placed with them. They are members of the Lutheran church.

Upon the return of Mrs. Giacopelli to her home in St. Louis, her husband learned that she had given up the baby. On May 27, just over one month later, Giacopelli appeared at the Crittenton Home demanding his child. The dependency order was thereafter vacated, on the ground that no jurisdiction had been obtained over the father, and on petitioners' motion the proceedings were dismissed. Respondents refused to deliver the child, and the present action was begun by the filing of a petition on July 1, 1957.

The respondents, on this appeal, generally contend that the Appellate Court erred in failing to determine the cause upon considerations of the best interests of the child, instead of the quantum of proof of the natural parents' fitness to have the custody of the child.

Primarily it appears to us that, although Helen Giacopelli has joined in this petition with her husband, she has forfeited her individual legal right to custody of the child. By sections 1 and 2 of the Foundlings Act (Ill. Rev. Stat. 1957, chap. 58, pars. 1 and 2) it is provided as follows:

"§ 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That hereafter when

any child in this state, under the age of one year shall be wilfully abandoned by its parents, and shall be taken and cared for by any charitable institution in this state, incorporated or otherwise, such parents so abandoning said child shall thenceforth lose all their right, control and authority over said child, and said right, control and authority shall thereupon become vested in said institution.

"§ 2. It shall be deemed a wilful abandonment, for the purposes of this act, if any such child be left by its parents at any such charitable institution."

In the construction of statutes the plural is considered to include the singular. (Ill. Rev. Stat. 1957, chap. 131, par. 1.03.) Thus while the word "parents" is used it may be construed to mean one or the other parent. There can be no question but that Helen Fontaine Giacopelli not only turned the child over to the Crittenton Home, but that she also made no further reference to the matter after so doing and left the home with full knowledge and appreciation of what she had done. Aside from the force and effect of the statute above, abandonment has been defined as meaning any conduct on the part of a parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. (*Stalder* v. *Stone*, 412 Ill. 488.) The evidence here shows a preconceived plan to give her baby up for placement and adoption. Pursuant to this preconceived plan she signed a consent to declaration of dependency and consent to appointment of guardian with power to consent to adoption of the child. By the overwhelming evidence this was freely done and in accordance with her desires expressed when she first entered the Crittenton Home. At no time prior to her return to St. Louis was there any deviation from her plan and settled purpose to forego all parental duties and relinquish all parental claims to the child. In fact, she made no effort and took no steps to alter the situation until the filing of the petition in this case. She should not now be permitted to change

that plan and purpose. Despite her protestations on the trial that she wanted the child, her conduct constituted abandonment of the child.

Nick Giacopelli signed no consent, such as executed by his wife, and he stands in a completely different position in this cause. His claim for custody of the child is governed by very different principles of law.

It is undisputed by the parties to this cause that *habeas corpus* is a proper method for determination of the custody of a child, in a dispute between the natural parents and third parties. It has so been accepted by the courts of this State. (*Cormack* v. *Marshall,* 211 Ill. 519; *Petition of Smith,* 13 Ill. 138; *Mahon* v. *People ex rel. Robertson,* 218 Ill. 171; *People ex rel. Noonan* v. *Wingate,* 376 Ill. 244.) It is not disputed by petitioners, and our court has indicated, that upon a hearing in such a cause, the trial court may inquire into the fitness of the contesting parties and resolve the question of what is for the best interests of the child. (*Petition of Smith,* 13 Ill. 138.) The controlling question in such a situation is: what is for the best interests of the child? *Mahon* v. *People ex rel. Robertson,* 218 Ill. 171.

It is always recognized that a natural parent has a superior right to the custody of his child. That right, however, is not absolute and must yield to the best interest of the child. Such superior right only obtains when it is in accord with the best interest of the child. (*Cormack* v. *Marshall,* 211 Ill. 519; *Stalder* v. *Stone,* 412 Ill. 488; *People ex rel. Noonan* v. *Wingate,* 376 Ill. 244.) The parent need not be shown to be totally unfit to rear the child in order to deny to him the custody of the child. Fitness of the parent is only one of the factors to be considered in determining how the best interest of the child may be served. The sufficiency of the parents' home, its surroundings, and all other matters that have a bearing upon the welfare of the child are to be considered. (*People* v. *Weeks,* 228 Ill. App. 262.) The parents' natural rights

must give way to the welfare and best interest of the child. *Sullivan* v. *People ex rel. Heeney,* 224 Ill. 468.

The Appellate Court recognized that the trial court found only that the welfare of the child would best be served by denying custody to the petitioners, but found that the trial court erred for the reason that the evidence failed to prove the petitioners unfit. It is not necessary that the natural parents be found unfit. (*People* v. *Weeks,* 228 Ill. App. 262.) That is only one of the many circumstances that may be considered in the determination of the one question in such a case as this. Giving full consideration to the primary and superior right of the natural parents to the custody of their child, what does the best interest of the child demand? The answer in this case is not easy, but is one necessary to be made—the welfare of this child will best be served by remanding him to the custody of the respondents. We cannot speculate with the life of a child, and we must accept that which is apparent. We cannot uproot the child from an adoptive home full of love, care, and opportunity, for the sole and only purpose of placing him with his natural parents—one of whom has abandoned him, and where the past conduct and character of the other fails to inspire any degree of confidence. The history of the father's behavior, if continued, could not be a good influence. The marital experience of both petitioners, and their conduct and statements in regard to each other, weigh heavily against their current affirmation of love, and the prospect of a happy, normal home for the child in their custody. The financial situations of the various parties do not concern us, beyond the ability to support and educate this child, but we cannot ignore the comparative physical advantages of the two homes.

Finally, the trial judge had the best opportunity to observe the parties and their conduct and demeanor while testifying. This is a vital factor in evaluating the correctness of his determination. We should not disturb his find-

ings unless they are palpably against the weight of the evidence. Upon our review, we cannot disagree with his findings. To remand this child to his natural parents would appear to constitute a tragic and unfortunate event in his young life.

Accordingly, the judgment of the Appellate Court is reversed and the order of the trial court is affirmed.

*Appellate Court reversed; circuit court affirmed.*

Mr. JUSTICE KLINGBIEL, concurring:

While I agree that custody should remain with respondents in this case, I think some contours should be given to the nebulous phrase "best interests of the child." To deprive natural parents of their child, in my opinion, requires more than someone else's idea of what is best for it, even if that someone else is a court. The test followed here, if it is a test in any sense of the word, does not gain meaning by mere repetition, nor do its words express limitations characteristic of our traditions in the role of government. Under its sanction the wholesale removal of children from parents, and their placement in State-controlled institutions may, under some conceptions of government, be justified as being in accord with their "best interests." The terms "welfare" and "best interests," however pleasing may be their sound, afford little in the way of a guide. Where the issue is fitness, the character, behavior and circumstances of particular individuals provide boundaries within which evidence can be confined and with respect to which rational decisions can be made. Where the issue is nothing more specific than welfare, the range of inquiry is virtually unlimited, with corresponding room for arbitrary or personal decision.

Contrary to the pronouncement in the majority opinion, I think it is necessary that parents be found unfit before their child may be taken from them against their will. Indeed, the specific reasons given by the court for its decision—aside from the bare declaration that the child's wel-

fare will best be served thereby—all concern the fitness of its parents. The decision is correct because the evidence clearly shows unfitness, not because the circumstances in respondents' home may be preferable to those of the natural parents. There is hardly any infant who could not be said to benefit, in some respects at least, by removal to someone ideally suited for parenthood. In almost every case persons other than the parents can be found who may be in better circumstances to raise it, may hold greater affection toward it, and may possess more intelligence not only in affording educational and material advantages but in fostering in the child a sense of responsibility, with a mature capacity to meet the problems and experiences of life. Viewed in isolation, the welfare of almost any child could be promoted by taking it from careless, irresponsible or overly protective parents and giving it to some one more qualified to care for and guide it and to supervise its growth and development. It is not enough, however, that as a matter of fact the child's interests would be better served by placing it in the custody of strangers. In applying the welfare test, the natural instincts of love, care, and interest which parents bear for their child outweigh whatever shortcomings they might have in comparison with strangers, and it is only where they are proved to be unfit to have the custody of children that a court will deprive them of it. (*People ex rel. Yarmulnick* v. *Hoff,* 323 Ill. App. 535; *Wohlford* v. *Burckhardt,* 141 Ill. App. 321.) Their right is superior to that of any other person when they are fit, materially, morally and emotionally, to have the custody of children; and courts should not curtail that right upon slight pretext, or where there is merely a difference of opinion as to the best course to pursue in raising the child. (*Lindsay* v. *Lindsay,* 257 Ill. 328.) It is only when they are unable or unwilling to give it the care, affection and support it should receive that a court may remove it to a more suitable environment. See *Ekendahl* v. *Svolos,* 388 Ill. 412, 414-415.

For the reason that the petitioners in this case have shown themselves unfit for custody of the child, I concur in the court's decision.

SCHAEFER and HOUSE, JJ., join in this concurring opinion.