BETTY BAEHR, Plaintiff-Appellee, *v.* WALLACE BAEHR, Defendant-Appellant.

Second District   No. 77-285

Opinion filed January 17, 1978.

GUILD, J., dissenting.

Samuel L. Dean, of Rockford, for appellant.

Peter S. Switzer, of Rockford, for appellee.

Mr. JUSTICE BOYLE delivered the opinion of the court:

The defendant-appellant, Wallace Baehr, hereafter the defendant, appeals from an order of the circuit court of Winnebago County denying his petition for a rule to show cause and an order barring him from visitation with his son,until further court order. The sole issue before this court is whether the trial court abused its discretion in entering these orders. Upon reviewing the record and weighing the arguments presented, we find that the judgment of the circuit court of Winnebago County should be affirmed.

The plaintiff-appellee, Betty Baehr, hereafter plaintiff, and the defendant were married in 1964 and divorced in 1967. The marriage produced one child, William, who was placed in the custody of the plaintiff, with the defendant's having reasonable visitation rights. After their divorce, the plaintiff and defendant attempted to effect a reconciliation. During this period, the defendant did have occasion to visit with his son. However, when the reconciliation efforts fell through in January of 1969, the defendant stopped seeing William. The record reveals that the defendant made no effort to have any form of contact with his son from January of 1969 until June of 1975. In June of 1975, the defendant telephoned the plaintiff, who had remarried, and asked for permission to see William. The plaintiff refused such permission and told the defendant that she did not want him to see William under any circumstances. On August 1, 1975, the defendant filed a petition for a rule to show cause, asking that the plaintiff demonstrate why she should not be held in contempt of court for violating the defendant's visitation rights. Thereafter, the Stewarts (plaintiff here and her second husband) filed a petition to adopt William.

Subsequently, the adoption petition and the petition for a rule to show cause were consolidated and a hearing was held before Judge John E. Sype. At that hearing, the defendant testified that he had not seen William from 1969 to 1975 because he was emotionally distraught over the breakup of his marriage and the failure of the reconciliation efforts. The hearing also included the testimony of three clinical psychologists, all of whom had the opportunity to examine William.

Dr. Thomas Hollon, a psychologist, testified that William looks upon his stepfather as his true father; that William expressed no spontaneous

curiosity or attachment toward his biological father; that William was basically a normal, healthy youngster; that he sees his family as his father (Mr. Stewart, his stepfather); his mother; and his stepbrother and stepsister, whom he looked on as older brother and sister. Dr. Hollen also testified that based on his clinical examination of the Stewarts, especially his direct clinical examination of Billy Stewart (the boy), and based on a reasonable degree of psychological certainty, it was his opinion that it would certainly be detrimental to the psychological adjustment of this 10-year-old boy to have the intrusion of his biological father into his life at this time.

Dr. Joseph Vaughan, a clinical psychologist and an associate of Dr. Hollon, testified that his examination of William revealed no indication which would suggest a presence of serious emotional instability or serious disorder. He testified that the boy expressed very positive feelings about his parents—his mother and stepfather—and that he is making a good adjustment in terms of school and the family situation. He further testified that the boy finds it difficult to deal with things that are out of the ordinary in terms of what he would expect; that he is a youngster whose needs would best be served by a continuation of the present situation rather than a change in it. On cross-examination Dr. Vaughan suggested that a biological father would present some disruption to the boy in terms of his emotional functioning. Dr. Vaughan said, "My impression and the results would indicate that Billy is very positively identified at the present time with his stepfather and sees him as his father and [has] positive feelings about him as his father. His responses to me in terms of his father were always in the direction of his stepfather. There were no indications in my work with the boy to suggest that questions or feelings about his origin were on his mind or were a concern to him at that time."

The third clinical psychologist, Dr. Harry Constantine, testified that he believed the defendant should have visitation rights with William, having found the boy to be very unstable emotionally. However, this psychologist also admitted on cross-examination that he believed a biological parent should be kept from his child only when that parent is unfit or a dangerous person.

Judge Sype directed that the boy visit his biological father at his (biological father's) house on three occasions.

Finally, Judge Sype, with the consent of both parties, interviewed the boy in his chambers with the court reporter and the guardian ad litem being present. During this interview William told the judge that one of the reasons he did not want to visit with the defendant was because he was afraid that once a relationship had been established, the defendant would desert him, as the defendant had done in the past. The boy also told the judge he was aware that his mother and stepfather were trying to adopt

him. He further said that during one of his visits with his biological father, he had been shown the adoption papers; further, that he liked his stepfather a lot and would not mind if his stepfather wanted to adopt him.

After hearing all of the evidence, the trial court concluded that it would be in the best interest of William if the defendant was not permitted to have visitation with him at that time and therefore barred such visitation until further court order. In the same order, the court denied the adoption proceeding and denied the petition for contempt.

In dealing with matters of child custody and visitation, the court's primary concern is and must be for the best interest of the child. (*Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300.) While a natural parent has a right to the custody and society of his child, that right must yield where the best interest of the child so dictates. (*Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556, 158 N.E.2d 613; *Marcus v. Marcus* (1974), 24 Ill. App. 3d 401, 320 N.E.2d 581.) That right may be yielded even to the extent of denying a parent visitation rights if the situation so warrants. *Huber v. Huber* (1960), 26 Ill. App. 2d 207, 167 N.E.2d 431; *In re Gonzales* (1974), 25 Ill. App. 3d 136, 323 N.E.2d 42.

Matters of child custody and visitation are within the sound discretion of the trial court. (*Kay v. Kay* (1974), 22 Ill. App. 3d 530, 318 N.E.2d 9.) In this regard, the trial court has broad discretion, and its finding should not be set aside unless it is clearly contrary to the manifest weight of the evidence. (*Lane v. Lane* (1976), 40 Ill. App. 3d 229, 352 N.E.2d 19.) In the case at hand the record clearly supports the finding of the trial court that it would be in the best interest of William if the defendant were "hereby barred visitation rights until further order of this court and until additional evidence is produced."

Therefore we affirm the judgment of the circuit court of Winnebago County.

Judgment affirmed.

RECHENMACHER, J., concurs.

Mr. JUSTICE GUILD, dissenting:

I dissent. I think the time has come when we should recognize the right of a natural father to see his child. There are, of course, circumstances where it would not be advisable but here we have a father who has been supporting his son for some 10 years, who is not shown to be objectionable in any way and who wants to visit with his son occasionally. The boy is now 12 or 13 years old and knows his natural father. I am not impressed nor swayed by the platitude of the "best interest of the child." I agree with the psychologist herein who testified that the biological father

should see the child. Frankly, I do not see how the best interest of this child can be affected by occasional visits with his natural father any more than he would be in occasionally visiting his aunt or uncle. We are considering *visitation*, not *custody*. I am sure that the boy in his later years will be interested in his natural father.

All of the cases cited by the majority deal only with change of custody with the exception of *Huber v. Huber* (1960), 26 Ill. App. 2d 207, 167 N.E.2d 431, and *Kay v. Kasy* (1974), 22 Ill. App. 3d 530, 318 N.E.2d 9. *In re Gonzales* (1974), 25 Ill. App. 3d 136, 323 N.E.2d 42, is far removed from the issue presented herein. In *Gonzales* the natural mother came from Massachusetts to Illinois where her daughter became ill. The appellate court made the general statements that it was not the function of the appellate court to substitute its judgment for that of the trial court and recognized that the natural parent has a superior right to custody of his or her child, but that right must yield to the welfare and the best interests of the child. The appellate court found no neglect on the part of the mother and custody was returned to the natural mother.

The case cited by the majority pertaining to custody and including visitation is *Huber*. In that case the natural mother deserted her husband and children. With the exception of two visits in 10 years the mother neither supported nor evinced any interest in the children until a petition for adoption was filed by the natural father and his then wife. The trial court denied change of custody to the mother, as well as visitation. I do not believe that the facts of that case bring it within the purview of the case before us. As I have stated, we are only considering visitation by the father with his 13-year-old son.

The father herein testified that he thought during the tender years of the child he would be better off in not visiting the child, but the record is clear that he continued to support the boy. His testimony was that he now felt that he would like to have visitation—which was provided for in the divorce decree. Visitation was denied by the mother and the defendant filed the instant proceeding, resulting in a countercomplaint for adoption by the mother and stepfather, which was denied by the trial court as well as the right of visitation by the father. The boy is entirely familiar with the fact that the appellant herein is his natural father and that the former Mrs. Baehr's present husband is his stepfather.

As was found in *Kay v. Kay*, cited by the majority, visitation by the noncustodial parent *is favored*. The court there further observed that where the right of visitation is reinstated, the same may be later modified by the trial court upon any further hearing pertaining to the best interests of the child if the visitation does not work out favorably. In any event, I feel the trial court was in error and further feel the majority herein has compounded that error. There is no evidence that the natural father

herein is unfit to visit with his child; this is not a custody matter; and a father who has supported his child for 11 years should have the opportunity to occasionally visit with that child with no interference from the natural mother.