*In re* PETITION OF JOHN DOE AND JANE DOE, Husband and Wife, to Adopt Baby Boy, a Minor.

First District (3rd Division)   No. 1—92—1552

Opinion filed August 18, 1993.

TULLY, P.J., dissenting.

Loren L. Heinemann, of Orland Park, for appellant.

Richard A. Lifshitz and Carolyn E. Winter, both of Chicago, for appellees.

JUSTICE RIZZI delivered the opinion of the court:

John and Jane Doe filed a petition to adopt a newborn baby boy, Richard.[1] Richard's biological mother, Daniella Janikova (Daniella), and father, Otakar Kirchner (Otakar), were not married. Daniella executed a consent to have Richard placed for adoption four days after he was born. Daniella, however, did not tell Otakar. Otakar was told that Richard died shortly after his birth. Daniella did not tell Otakar that Richard was living and had been placed for adoption until Richard was 57 days old. After he discovered that Richard had been placed for adoption, Otakar opposed the adoption on the basis that he did not consent. Otakar and Daniella then got married. The adoption case proceeded to trial. The trial court found that Otakar was an unfit person to have a

---

[1] Richard is a fictitious name which we are using to make reference to the baby boy who is the subject of this case.

child and therefore his consent for the adoption of Richard was not required. (750 ILCS 50/8, 14 (West 1992).) The trial court then entered a judgment of adoption, with John and Jane Doe adopting Richard. Otakar has appealed from the judgment of adoption and the orders inherent to the validity of the judgment of adoption. We affirm.

Otakar, age 36, and Daniella, age 25, are emigres from the former republic of Czechoslovakia. Otakar arrived in the United States in 1986, and Daniella arrived in 1988. In the fall of 1989, they met while working together at a restaurant. They then began living together in an apartment in Chicago. In June of 1990, Daniella became pregnant and she and Otakar were advised that the baby was due to be born on March 16, 1991. Around July of 1990, Daniella stopped working and became a full-time student to become a beautician. She was dependent solely upon Otakar for financial support.

Otakar and Daniella continued to live together, and Otakar paid for Daniella's prenatal care. They planned that the baby would be born at St. Joseph's Hospital in Chicago, which is only one block from where they lived.

In January of 1991, Otakar returned to Czechoslovakia for a vacation and to attend to family matters related to his gravely ill grandmother. He remained in Czechoslovakia about 13 days. While Otakar was in Czechoslovakia, however, Daniella received a telephone call from Otakar's aunt. She told Daniella that Otakar had been seeing his former girl friend in Czechoslovakia and that they had married and were on their honeymoon. Daniella became upset. She telephoned Otakar in Czechoslovakia and told him that she did not want to see him anymore. Otakar told Daniella that the story his aunt told her was not true. Nevertheless, Daniella moved out of the apartment and into a shelter for abused women located in Chicago.

While she lived at the shelter, Daniella decided that she would place the baby for adoption. Daniella told her friend, Roberta Scholes, of her plan. Scholes contacted a lawyer for Daniella. Meanwhile, on February 8, 1991, Otakar returned from Czechoslovakia and went to his apartment, where he found that Daniella had moved out and taken all of her belongings.

On February 11, 1991, Daniella met with the lawyer and John and Jane Doe about the proposed adoption. Daniella refused to disclose the name of the baby's biological father to the Does or their lawyer.

There were several meetings between Daniella and the Does and their lawyer. At the meetings, Daniella stated that she knew who the biological father of the baby was, but she did not want to disclose his identity because she feared that he would assert his parental rights.

In mid-February 1991, Daniella left the shelter and went to live with her uncle in his house in the Village of Hillside. Otakar knew that Daniella was living at her uncle's house. Otakar telephoned Daniella several times, but she refused to speak to him or return his calls.

Otakar claims that he asked mutual friends to talk to Daniella on his behalf, but Daniella refused their efforts. In addition, during the latter part of February 1991, Otakar gave $500 to a mutual friend, Selva Duran, and asked her to give the money to Daniella. Daniella, however, refused to take the $500.

During the latter part of February, Daniella met with Otakar twice. First, they met at a restaurant. The following day, approximately February 28, 1991, Daniella went to Otakar's apartment where they engaged in sexual intercourse. Otakar asked Daniella to return and live with him in the apartment, but she refused. The next day, Daniella telephoned Otakar and told him that she did not want to see him again. Nevertheless, Otakar made numerous telephone calls trying to reach Daniella at her uncle's house, to no avail.

On March 16, 1991, Daniella went to Alexian Brothers Hospital in Elk Grove Village, Illinois, and Richard was born. Daniella refused to name or identify the biological father of the child. Meanwhile, on March 16, 1991, Otakar had made inquiry about Daniella at St. Joseph's Hospital because when they were living together that is where he and Daniella had planned to have the birth of the baby. He was told that Daniella had not been admitted into the hospital. Otakar checked with St. Joseph's Hospital for several days and each time he was told that they had no record of a Daniella Janikova.

On March 20, Daniella executed a document entitled "FINAL AND IRREVOCABLE CONSENT TO ADOPTION," for Richard, at the Cook County Department of Supportive Services. (See 750 ILCS 50/9, 50/10 (West 1992).) On the same day, the Does filed a petition for adoption, which averred that the biological father of the child was unknown. Also, a statutory notice by publication was made in the Chicago Daily Law Bulletin, with the averment that the biological father of the child was unknown. (750 ILCS 50/7 (West 1992).) March 20, 1991, was also the day that Richard was placed to live with the Does.

Otakar had not been told that Richard had been placed for adoption. On March 20, 1991, Otakar spoke with Daniella's uncle on the telephone. Daniella's uncle told Otakar that the baby had died three days after birth. Daniella's uncle had lied about what had occurred at the direction of Daniella. Daniella's uncle spoke to Otakar subsequently on two other occasions, and each time he told Otakar that the baby had died. It appears, however, that Otakar did not believe that the baby had

died. On about March 26, Otakar telephoned Daniella at her uncle's house and left a message on the answering machine: "I don't believe the baby died."

Otakar claims that on many occasions after work at around 3 a.m., he went to Daniella's uncle's house, where Daniella was living. He looked into Daniella's parked automobile to see if there was an infant's car seat or baby bottles; he also went through the garbage cans at the curb of the house to see if there were any diapers or other similar items. Otakar also claims that he made inquiry at some hospitals seeking information about Daniella and the birth of the baby, to no avail. He also claims that some friends helped him in searching through official public records for a birth or death certificate. They found nothing.

At some time between May 5 to May 10, 1991, Selva Duran told Otakar that the baby did not die but was placed for adoption. This is the first time that Otakar had been told that the baby had been placed for adoption. Otakar did not see or speak to Daniella, however, until May 12, 1991; he had not seen or spoken to Daniella since March 1, 1991. When Otakar went to his apartment after work on May 12, 1991, he found that Daniella had moved back into the apartment, and she told him that the baby had been adopted. Otakar testified: "She said she made a mistake and she can't do nothing anymore because she signed away her whole rights."

On May 18, 1991, more than two months after Richard was born, Otakar spoke to a lawyer for the first time about this matter. On June 6, 1991, Otakar filed an appearance in the adoption proceeding, and on June 13 he sought leave of court to file an answer. On June 15, 1991, the trial court struck Otakar's answer on the basis that he had no standing in the adoption proceeding.

On September 12, 1991, Otakar and Daniella married. On September 23, 1991, Otakar filed a petition to declare paternity. The paternity action proceeded to trial on December 9, 1991, and on that day there was a finding that Otakar was the biological father of Richard.

On December 23, 1991, the Does filed an amended petition to adopt. The amended petition alleged that Otakar was an unfit person to have a child and that therefore his consent for the adoption of Richard was not required. (750 ILCS 50/8, 14 (West 1992).) The amended petition alleged that Otakar was unfit for the reason that there was a "failure to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days after its birth." 750 ILCS 50/1(l) (West 1992).

The adoption trial started on May 5, 1992. On May 6, 1992, the trial court found by clear and convincing evidence that Otakar had failed to

demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a newborn child during the first 30 days after the birth. In making its ruling, the trial court stated:

"That brings me to the conclusion that the law must be strictly complied with, and that the law provides for some interest in the reasonable degree of interest for the child in the first thirty days of the child's existence. Had Mr. Kirchner, instead of probing through garbage bags, gone to [legal counsel] at that juncture there would be no such proceedings here. She would have been in Court, that is Daniella Janikova, and she would have been telling the world where the child was and disclosing what interests Mr. Kirchner had in this child. Instead of that in all this time that he wasted trying to contact hospitals, and, again, looking through garbage, he found nothing.

Daniella, of course, testified here in open court that she deliberately lied about the birth of the child in suggesting the death of the child, unconscionable behavior.

So it is going to be the finding of this court that there is clear and convincing evidence that there was no reasonable degree of interest indicated by Mr. Kirchner in the first thirty days of the life of this child."

On May 8, 1992, the trial court entered an order that Otakar was an unfit person to have a child and that therefore his consent for the adoption of Richard was not required, and that his parental rights were terminated. On May 13, 1992, a judgment for adoption of Richard was entered, with the irrevocable consent to adoption executed by Daniella on March 20, 1991, but without the consent of Otakar. See 750 ILCS 50/14 (West 1992).

Otakar filed a notice of appeal on May 8, 1992. On appeal, Otakar claims that the judgment of adoption and the orders inherent to the validity of the judgment of adoption should be reversed, and that Richard should be turned over to live with him and Daniella.

Richard has lived continuously with John and Jane Doe since March 20, 1991, four days after his birth. He is now, August 18, 1993, two years and five months old.

Fortunately, the time has long past when children in our society were considered the property of their parents. Slowly, but finally, when it comes to children even the law has rid itself of the *Dred Scott* mentality that a human being can be considered a piece of property "belonging" to another human being. To hold that a child is the property of his parents is to deny the humanity of the child. Thus, in the present case we start with the premise that Richard is not a piece of property with

property rights belonging to either his biological or adoptive parents. Richard "belongs" to no one but himself.

Of course, in any parental relationship a parent and a child both have rights, vis-a-vis each other, which are protected under the law. In an adoption, custody or abuse case, however, the child is the real party in interest. Since the child is the real party in interest, it is his best interest and corollary rights that come before anything else, including the interests and rights of biological and adoptive parents.

Here, by inherent necessity, whether or not raised by the embroiled and warring biological and adoptive parents, the best interest of Richard surfaces as the paramount issue in the case.[2] If there is a conflict between Richard's best interest and the rights and interests of his parents, whoever they may be, the rights and interests of the parents must yield

---

[2] On the issue of the best interest of the child, the parties have referred to *In re Adoption of Syck* (1990), 138 Ill. 2d 255, 562 N.E.2d 174, for the proposition that the best interest of the child should not be considered when determining whether a parent is unfit. *Syck*, however, is distinguishable and not controlling here. In *Syck*, there was no judgment of adoption entered; the child was not a newborn, but rather was eight years old; the issue of unfitness did not relate to the first 30 days after the child's birth, as does the present case; and the issue of unfitness involved section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b)), rather than section 1(D)(l) (750 ILCS 50/1(D)(l)). Also, after *Syck* was decided, the Illinois legislature has made it the public policy of Illinois that the best interest of the child must be considered and be paramount to the interests of his parents in making a permanent home for the child. (See 705 ILCS 405/2—14 (West 1992), amended, effective June 24, 1993.) Moreover, our holding as to the best interest of the child is consistent with what the Illinois Supreme Court has stated:

"In *Giacopelli v. The Florence Crittenton Home*, 16 Ill. 2d 556, we stated at 565: 'It is always recognized that a natural parent has a superior right to the custody of his child. That right, however, is not absolute and must yield to the best interest of the child. Such superior right only obtains when it is in accord with the best interest of the child.' [Citations.]

The best interest of the child is the standard and it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody, if it is in the best interest of the child that he be placed in the custody of someone other than the natural parent. [Citations.]

*** The parents' natural rights must give way to the welfare and best interest of the child." *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 209, 247 N.E.2d 417, 421.

In determining whether the biological father was unfit pursuant to the Adoption Act, the Illinois Supreme Court stated in *In re Abdullah*:

"Moreover, the paramount consideration in this case is what will happen to Hannibal. (Ill. Rev. Stat. 1977, ch. 40, par. 1525.) His best interest must be considered, and further delay in the disposition of this case is not in his best interest. Hannibal is already 6 years old. His future should be settled as quickly as possible." *In re Abdullah* (1981), 85 Ill. 2d 300, 310, 423 N.E.2d 915, 920.

and allow the best interest of Richard to pass through and prevail. This tenet allows for no exception.

■■ A child's best interest is not part of an equation. It is not to be balanced against any other interest. In adoption cases, like custody and abuse cases, a child's best interest is and must remain inviolate and impregnable from all other factors, including the interests of the parents. (*In re Ashley K.* (1991), 212 Ill. App. 3d 849, 879, 571 N.E.2d 905, 923; 705 ILCS 405/2—14(a) (West 1992); 750 ILCS 50/20a (West 1992).) In recognition of this fact, the Adoption Act provides:

"Best interest and welfare of child—Construction of Act
*** The best interests and welfare of the person to be adopted shall be of paramount consideration in the construction and interpretation of this Act." 750 ILCS 50/20a (West 1992).

Attempting to resolve what is the best interest of an infant is obviously a wrenching ordeal. In cases like the present, however, if one focuses on the child while disregarding the tendentious arguments of the biological and adoptive parents, he is left with the unquestionable conclusion that resolution of the issue of parentage quickly is foremost in the best interest of the child. Also, serious delay in resolving the child's parentage not only frustrates the best interest of the child, but it can cause grave harm to the child.

The best interest of children was recently considered by the Illinois legislature when it amended the Juvenile Court Act to place the best interest of children paramount to the rights and interests of parents. The Juvenile Court Act, as amended, reads as follows:

"Date for Adjudicatory Hearing.
(a) Purpose and policy. The legislature recognizes that serious delay in the adjudication of abuse, neglect, or dependency cases can cause grave harm to the minor and the family and that it frustrates the best interests of the minor and the effort to establish permanent homes for children in need. The purpose of this Section is to insure that, consistent with the federal Adoption Assistance and Child Welfare Act of 1980, Public Law 96—272, as amended, and the intent of this Act, the State of Illinois will act in a just and speedy manner to determine the best interests of the minor, including providing for the safety of the minor, identifying families in need, reunifying families where it is in the best interests of the minor, and, if reunification is not in the best interests of the minor, finding another permanent home for the minor."

Pub. Act 88—7, eff. June 24, 1993 (amending 705 ILCS 405/ 2—14 (West 1992)).

The Federal Adoption Assistance and Child Welfare Act of 1980, Public Law 96—272, as amended, to which the Juvenile Court Act makes reference, reads as follows:

- "The term 'case review system' means a procedure for assuring that—

\* \* \*

(C) with respect to each child, procedural safeguards will be applied, among other things, to assure each child in foster care under the supervision of the State of a dispositional hearing to be held \*\*\* no later than eighteen months after the original placement \*\*\*, which hearing shall determine the future status of the child (including, but not limited to, whether the child should be returned to the parent \*\*\* [or] should be placed for adoption \*\*\*) \*\*\*." 42 U.S.C. §675(5)(C) (1988).

■ We extrapolate and infer from the Juvenile Court Act, as amended, and the Federal Adoption Assistance and Child Welfare Act of 1980, Public Law 96—272, as amended, that after a newborn child has been placed for adoption and lives continuously thereafter for longer than 18 months with his adopting parents who adopt or have adopted him pursuant to a judgment of adoption, it would be contrary to the best interest of the child to remove him from his home and family by disturbing the judgment of adoption.[3]

■ The present case vividly illustrates why it would be contrary to the best interest of the child to remove him from the parents who adopted him if he has lived with them continuously for the first 18 months of his life. Richard is now two years and five months old. The only parents that he has ever known are John and Jane Doe. He has not touched or seen Daniella since four days after his birth, and he has never spoken a word to her. Nor has he

---

[3]The Adoption Act itself recognizes time limitations in adoption proceedings, even in actions based on fraud and duress. The Adoption Act provides: "No action to void or revoke a consent to or surrender for adoption, including an action based on fraud or duress, may be commenced after 12 months from the date the consent or surrender was executed." 750 ILCS 50/11 (West 1992).

ever touched, seen or communicated with Otakar. In fact, he is totally unaware of the existence of Daniella and Otakar.[4]

The fact that we have the Adoption Act in Illinois is a recognition in the law that it takes more to being a parent than being one of the sexual partners to the physiological formation of a child. Since Richard was a newborn, John and Jane Doe have done everything with Richard that is the essence of being parents, and Richard has done everything with them that is the essence of being a son. Contrariwise, since he was a newborn, Daniella and Otakar have done nothing with Richard that is the essence of being parents, and he has done nothing with them that is the essence of being a son.

There comes a point when we should not be ignorant as judges of what we know as men and women. (See *Watts v. Indiana* (1949), 338 U.S. 49, 52, 93 L. Ed. 1801, 1805, 69 S. Ct. 1347, 1349; *People v. Gilliard* (1983), 112 Ill. App. 3d 799, 807, 445 N.E.2d 1293, 1300.) Plainly, it would be contrary to the best interest of Richard to "switch" parents at this stage of his life. We must therefore act accordingly. Courts are here to protect children—not to victimize them.

Under the circumstances, we conclude that it would be contrary to the best interest of Richard to disturb the judgment of adoption. We, therefore, affirm the judgment of adoption and the orders inherent to the validity of the judgment of adoption for the reason that it would be in the best interest of Richard and he is the real party in interest.

■ We also affirm the judgment of adoption and the orders inherent to the validity of the judgment of adoption for another reason. There is clear and convincing evidence that Otakar was an unfit person to have a child because he failed to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a newborn child during the first 30 days after the birth. (750 ILCS 50/1(D)(l), 8(1) (West 1992).) His consent to the adoption was therefore not required. 750 ILCS 50/14 (West 1992).

One may rightfully infer that a man who has a reasonable degree of interest, concern or responsibility as to the welfare of his newborn child

---

[4]Although the interest of Daniella is not legally an issue, one can hardly blink at the reality of her interest in the case. After refusing to identify Otakar as the biological father of Richard and signing a final and irrevocable consent to adoption, she lied about Richard's birth. She attempted to obtain a fake death certificate for him. She later had her uncle tell Otakar that Richard died. Subsequently, however, she married Otakar. Now, both Otakar and Daniella wish to have the judgment of adoption vitiated. In such instances, courts should not favor any interest that the biological mother may have in the case, and should view her testimony as would Diogenes.

would have assiduously tracked what was happening during the pregnancy and the birth of the child. It follows that when a court is considering whether a biological father has demonstrated a reasonable degree of interest, concern or responsibility as to the welfare of his newborn child during the first 30 days after the birth, the court may consider what occurred during the entire pregnancy and birth as going to the weight and credence of the testimony and evidence in the case.

Here, we must bear in mind that Otakar had returned from Czechoslovakia and was living in Chicago more than a month before Richard was born. Although he and Daniella were not married, he knew the due date for the birth of Richard. Yet, he did virtually nothing that a responsible unwed man would do if he expected that a woman would soon give birth to his child. It is no solace for Otakar to claim that the mother did not answer his telephone calls and he let it be. More needed to be done to demonstrate a reasonable degree of interest, concern and responsibility for the welfare of one's expected child.

Specifically and most telling, Otakar knew where the mother lived but *never* went to her residence to speak to her directly and confront her about the welfare of his expected child. Moreover, he did not write to the mother about his concern for the welfare of his expected child; he did not contact the physician whom the mother had been seeing for prenatal care to obtain information and express his concern for the welfare of his expected child; he did not show any effort to participate in giving his expected child a first name or surname; and he did not consult a lawyer or any public legal agency to determine his rights and responsibilities as an unwed father with respect to the birth, care or custody of his expected child.

In addition, an unwed man who sincerely believes that he was one of the sexual partners to the physiological formation of a child may file a lawsuit to determine legally whether he is the father and assert his parental rights *before* the child is born. (750 ILCS 45/7 (West 1992).) Otakar did not file such a lawsuit. Had he done so, he could have asserted his parental rights for Richard from the moment Richard was born. It is no excuse for Otakar to claim that he did not know the law, since he did not bother to seek legal advice.

Thus, the record clearly shows that although Daniella did not return Otakar's telephone calls shortly before Richard was born, Otakar was content "to just let his child be born" without any interest, concern or responsibility as to the care, custody or welfare of the child. This fact goes to the weight and credence of the testimony and evidence as to what occurred within the first 30 days after the birth of Richard.

Otakar's conduct within the first 30 days after Richard was born is consistent with his lack of interest and concern shortly before Richard was born. Otakar claims that on March 16, 1991, the day Richard was born, he went to St. Joseph's Hospital and was told that Daniella had not checked into the hospital that day. He checked with St. Joseph's Hospital for several days and each time he was told that the hospital had no record of a Daniella Janikova.

On March 20, 1991, Otakar spoke with Daniella's uncle on the telephone and Otakar was told that the baby had died three days after birth. Otakar spoke to Daniella's uncle subsequently on two other occasions and on each occasion the uncle told Otakar that the baby had died. On or about March 26, 1991, however, Otakar telephoned Daniella's uncle and left a message on the answering machine stating that he did not believe that the baby died.

Otakar claims that on several occasions he went to Daniella's uncle's house, where Daniella was living, and looked into Daniella's car to see if there were any objects that would ordinarily be used by an infant. He also went through the garbage cans at the curb of the house looking for diapers or other objects that might be used by a baby. In addition, Otakar claims that he made inquiries at a few hospitals to see if Daniella had been admitted. He also claims that he had some mutual friends attempt to speak to Daniella on his behalf, and that some friends aided him in searching through official public records for birth or death certificates.

There is no evidence that Otakar did anything else until May 12, 1991, or the first 57 days after Richard was born, to determine whether Richard was living or dead. Specifically, Otakar did not go to the mother's residence to speak to her directly and confront her about the birth, care, custody or possible death and funeral arrangements and burial of his child. Moreover, he did not write to the mother about the birth, care, custody or possible death and funeral arrangements and burial of his child; he did not contact the physician whom the mother had been seeing for prenatal care concerning the birth or possible death of his child; and he did not consult a lawyer or any public legal agency to determine his rights and responsibilities as an unwed father with respect to the birth, care, custody or possible death and funeral arrangements and burial of his child.

In addition, Otakar's self-serving statements about looking in the mother's car and in garbage cans lack credibility and are not convincing. The statements were not corroborated and they are inexplicable. According to Otakar, although he knew where she was living and was in front of her residence on several occasions, he never rang the mother's doorbell or knocked on her door to speak to her directly and confront her about the

birth or death of the baby. Why would a father who was truly concerned about the life, welfare or death of his baby not have rung the doorbell or knocked on the door?

Judging from what Otakar did and did not do, Otakar was apparently content to go on with his life never truly knowing whether he had a child who was living or had a child who had died. Surely, the scant and churlish effort made by Otakar to discover whether his child was alive or dead does not demonstrate "a reasonable degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days of its birth." 750 ILCS 50/1(l) (West 1992).

Our conclusion is in accord with the conclusion of the guardian *ad litem* for Richard. The guardian *ad litem* participated in all of the lower court proceedings, including the trial. At the conclusion of the evidence, the guardian *ad litem* advised the trial court as follows:

> "The legislature has acknowledged that all decisions under the Adoption Statute must keep an eye to what is in the child's best interest, but in weighing best interest, as counsel for the petitioner has argued, the Court cannot look at which home might be a better home. That is not an issue. The Court must evaluate the statutes, however, with recognition of the fact that we are dealing with a baby here. We are not dealing with a trophy which is to be passed from person to person. We are dealing with a child who on account of the actions of the mother of the child was placed into a home straight from the hospital where that baby was born. That is a fact which was established by the evidence which was presented in this case.
>
> * * *
>
> I believe that the evidence which has been adduced before this Court has established by a clear and convincing standard that Mr. Kirchner is an unfit person under this section of the Adoption Act.
>
> * * *
>
> I believe consequently that the Court can determine that Mr. Kirchner is not required to consent to this adoption pursuant to the provisions of Chapter 40, Section 1510."

After a thorough review of the record, we agree with the statements and conclusion of the guardian *ad litem*.

We therefore affirm the judgment of adoption and the orders inherent to the validity of the judgment of adoption for the reasons that Otakar was an unfit person to have a child and his consent to the adoption was not required. See 750 ILCS 50/8(1), 14 (West 1992).

Finally, we are constrained to address another matter in this case. Richard's story is the account of a helpless child caught in the quagmire

of a judicial system that in attempting to resolve his problem became part of his problem. It has taken two years and five months for this case to sluggishly move through our judicial system. In a case of this nature, where plainly time is critical, it is a sad commentary on our judiciary.

It shamefully took one year and almost two months from the time that the petition for adoption was filed to the time that the judgment of adoption was entered. It has shamefully taken one year and three months from the time that the notice of appeal was filed to decide this case in the appellate court.[5]

It is surely imperative that the judiciary have enough judges and proper judicial case management in place at both the trial and appellate levels so that "time" does not become a factor in the decisional process of a case. Every effort must be made to see that we do not have any more cases in Illinois where it takes two years and five months to determine the lawful parentage of a young child. Moreover, the judiciary must come to grips with the fact that the psyche of our society can ill afford cases where children are "switched" parents after the first 18 months of their life.

Accordingly, the judgment of adoption and the orders inherent to the validity of the judgment of adoption are affirmed for the reasons stated.

Affirmed.

CERDA, J., concurs.

PRESIDING JUSTICE TULLY, dissenting:

The majority, in its misguided fervor to champion "justice," has patently distorted and slanted the actual facts of this case on a number of important points. In fairness to the biological parents, as well as to Baby Richard, who will probably someday be confronted with the reality of his plight, the following clarifications are necessary to a just analysis of this case.

The majority somewhat misleadingly states: "Otakar did not see or speak to Daniella *** until May 12, 1991; he had not seen or spoken to Daniella since March 1, 1991." (254 Ill. App. 3d at 409.) As will be explained below, he attempted to contact her on numerous oc-

---

[5]The attorneys are not blameless for the delay. No attorney in this case has ever filed a motion to advise the court of the exigent nature of the case or to have the case expedited. As a result, this case just "hung around" on the court's case calendar in the trial court and in the appellate court as if it were not a case involving an exigency.

casions during the month of March and in fact did speak to her in the hospital on at least one occasion. Later the majority asserts: "he did virtually nothing that a responsible unwed man would do if he expected that a woman would soon give birth to his child." (254 Ill. App. 3d at 415.) In fact, Otakar attempted to send $500 to Daniella through their mutual friend, Selva, but Daniella refused the money. This would indicate a desire to provide for future financial arrangements, even after the baby's birth. Daniella had told Selva as well as other mutual friends that the baby had died at birth and they later repeated this to Otakar. Otakar also paid all prenatal medical and living expenses and he arranged for delivery of the baby at St. Joseph's Hospital, which was conveniently located very near to the couple's apartment.

The majority repeatedly mentions Otakar's failure to make funeral and burial arrangements for the baby. (254 Ill. App. 3d at 416.) As his testimony will show, Otakar did not really believe the baby had died, but on the other hand, he had no proof of the baby's existence and had not the vaguest idea that the baby had been given away without his consent. Finally, in a most egregious departure from all evidence presented in the record, the majority declares: "Otakar was content 'to just let his child be born' without any interest, concern or responsibility." (254 Ill. App. 3d at 415.) and "Otakar was apparently content to go on with his life never truly knowing whether he had a child who was living or had a child who had died." (254 Ill. App. 3d at 417.) The following presentation of *all* the facts will clearly demonstrate that the majority in this case has employed judicial sophistry in creating an untruthful scenario of the "big, bad and unfit" biological father in this case.

I. STATEMENT OF FACTS

The birth mother, Daniella, was single and 24 years old at time of becoming pregnant. She immigrated to the United States from Czechoslovakia in August 1988 to live with her uncle. In November 1989, she began living with petitioner, Otakar, at his Lake Shore Drive apartment. She first found out she was pregnant in June 1990. Her due date, March 16, 1991, was also the eventual date of Baby Richard's birth. Otakar was informed of the baby's due date and delivery arrangements were scheduled for St. Joseph's Hospital in Chicago.

Otakar, also an immigrant from Czechoslovakia, returned to his homeland in January 1991 for two weeks in order to visit his ill grandmother. During this time, Daniella received a phone call from

Otakar's aunt in Czechoslovakia informing Daniella that Otakar had resumed dating his former girl friend, that they were still in love and acting as if they had never broken up. She reacted to this phone call by ripping up the marriage certificate, required for a marriage under Illinois law, and previously obtained by Daniella and Otakar. However, the marriage was delayed due to their conflicting work schedules. Daniella then gathered her belongings and moved from Otakar's apartment to a shelter for women in an apparent state of desperation and confusion.

At the time, she was eight months pregnant and not working. She spoke with a social worker, Ms. Scholes, who said she had two options: (1) put the baby up for adoption or (2) wait for the father to return and see what he says. She refused to disclose the name of the father to the social worker and told her that "she would lie" to the father in order to allow the adoption of the baby. This triggered the process which culminated in the destruction of the family planned by Daniella and Otakar. (Would not counseling have better helped Daniella to deal with this emotional period, rather than pressure from a social worker to consent to adoption?)

Daniella then met with the adoptive parents, the Does, and told them she wanted a two-parent family for her baby, because if she went back to Otakar it would be without a baby. She was then contacted by the Doe's attorney, Tom Panichi. Daniella told him she knew the name of the birth father but refused to give it because she did not want him to have any rights to the baby. She also informed Panichi that she planned to tell the father that the baby had died at birth. This encounter with Daniella should have been a warning signal to both Panichi and the Does of Daniella's dubious emotional state.

At this time, Daniella knew Otakar was back in the United States because she had called him at work. She called him on Valentine's Day 1991 and said: "I just want to remind you to call somebody who you love." She then hung up the phone without giving Otakar a chance to respond. She told the Does that Otakar had her number at the shelter and that she did not feel safe. This behavior would perhaps be indicative of a scorned, pregnant woman, who began to question her feelings for Otakar.

Thereafter, Daniella moved to her uncle's house in Hillside, Illinois. She called Otakar one day at work and met him later at a restaurant. Otakar knew she was living at her uncle's house. They met the next day at Otakar's apartment, where they attempted to reconcile and they engaged in sexual relations. Afterwards, Daniella became confused and told Otakar she did not know what she wanted, as

far as a future with him or the baby. This further corroborated Daniella's then confused mental state.

After the birth of Baby Richard on March 16, 1991, she avoided Otakar and she refused to accept his phone calls. The baby was delivered at a hospital near the uncle's suburban home instead of St. Joseph's Hospital as planned. Otakar did not know where the baby was delivered and went to St. Joseph's Hospital in search of Daniella and the baby. Daniella told her uncle to tell Otakar that the baby had died and he obliged. She remained living at her uncle's house until May 12, 1991, when she resumed living with Otakar. At this time she confessed all of her prior falsehoods about the death of the baby and how she had consented to the baby's adoption.

On March 19, 1991, three days after Baby Richard's birth, the adopting parents, the Does, filed a petition to adopt Baby Richard, falsely alleging that the father of the baby was "unknown" and that the address of said father was unknown. In their amended petition to adopt, count I alleged that the parental rights of the natural mother, Daniella, were terminated on March 20, 1991, after she voluntarily consented to allow her son, born on March 16, 1991, to be adopted. Count I further alleged that the natural father, Otakar Kirchner, was an *"unfit parent"* under section 1 of the Adoption Act (750 ILCS 50/ 1(l), 14 (West 1992)) in that he: (a) failed to show a reasonable degree of interest in the child within the first 30 days of life; (b) abandoned the child; and (c) engaged in open and notorious fornication. The fornication allegation was later dropped from the petition.

In the alternative, count I stated that Otakar's consent to the adoption was not necessary under section 8 of the Adoption Act (750 ILCS 50/8 (West 1992)) in that:

    (a) he was informed he was the father of the child;

    (b) the child was placed for adoption under six months;

    (c) and he failed to do at least one of the following:

        (1) openly live with the child for at least one half length of the child's life prior to adoption;

        (2) openly hold himself out to be the father during such period of time; or

        (3) pay a fair and reasonable sum for medical expenses.

At the adoption hearing, counsel for the Does made the following arguments: Otakar did not: (1) live with child; (2) hold himself out as the father; and (3) did not pay reasonable medical expenses. They also alleged that Otakar did not: (1) show a reasonable degree of interest in Baby Richard within 30 days of birth; and (2) abandoned Baby Richard. Counsel also argued that the fact he married the birth

mother six months later did not in any way affect whether he was fit or showed a reasonable degree of interest within the first 30 days of the baby's life.

Otakar asserted an affirmative defense under the Adoption Act, which provides that impediments beyond a father's control are a defense to his showing a reasonable degree of interest in the child within 30 days after birth. Specifically, Otakar asserted as a defense the deception of the birth mother in representing to Otakar that Baby Richard had died at birth and in hindering all contact with her after the birth of Baby Richard. Upon finding out about the adoption on May 12, 1991, Otakar contacted an attorney and promptly moved on June 6, 1991, filing an appearance challenging the adoption of his infant son by the Does. Thus, Otakar exhibited a "reasonable degree of interest" in his child within 30 days of finding out about the existence of the child as well as his adoption, and after the impediment had been removed.

Otakar testified that during eight months of Daniella's pregnancy, prior to her leaving his apartment, he paid for all household expenses and maternity clothes and other expenses relating to the pregnancy. Moreover, he fully supported Daniella so that she did not have to work during the pregnancy. During his first week in Czechoslovakia, he and Daniella talked to each other every day, then Daniella stopped answering the telephone. During their final overseas phone conversation, Daniella accused Otakar of honeymooning with his ex-girl friend. When he returned to his apartment in Chicago, the keys and a torn-up marriage license were thrown on a table. She had never told him she was considering adoption. He had recently allowed her to purchase a car on his credit card. They got back together for a day at Otakar's apartment and Daniella "was talking like nothing had happened." Otakar listened to the baby moving inside and they discussed the baby's birth. The next day she called him at work and said she did not know her feelings toward him. Then she said she did not want to see or talk to Otakar anymore. This was sometime around February 28, just two weeks before Baby Richard's birth.

On the due date, March 16, Otakar called St. Joseph's Hospital and went there personally looking for Daniella but she was not there. On March 20, four days after the baby's due date, Otakar spoke with the uncle who said the baby had died. He had absolutely no knowledge of the adoption or Daniella's plans to consent to adoption. At the end of March, he left a message on the answering machine at her uncle's house that he did not believe that the baby had died. He then started driving to the uncle's house every day looking for evidence of

a baby. On at least one occasion he was stopped by police and questioned about his loitering around the uncle's house.

A customer from the restaurant managed by Otakar contacted Senator Paul Simon's office to find out if a death certificate had been issued on the baby, but the search was only valid for the City of Chicago, not the suburbs, where the baby was delivered. Otakar also testified that other friends confirmed Daniella's story that the baby had died.

Otakar tried calling Daniella four or five times a day but she would not pick up the phone. He also tried sending her $500 in cash through their mutual friend, Selva. He did not speak to her again until after the baby was born around March 25, when he talked to her briefly in the hospital. (Apparently, Daniella had called him from the hospital, but Otakar did not know which one.)

The attorney who handled the adoption for the Does, Tom Panichi, testified that he knew that Daniella was reluctant to furnish the name of the birth father. He also knew she had continued contacts with the father and that she was planning to tell the birth father that the baby had died. She even asked Panichi if he could help in her scheme to falsify a death certificate for the baby. Daniella later told the Does that she thought a child should be raised by a two-parent family.

It should be noted that under Illinois law, in order to serve notice of an adoption to the father by publication, the attorney must inquire as to the address of the father. Panichi signed a notarized "Affidavit For Service By Publication" wherein he stated under oath that the father "on due inquiry cannot be found so that process cannot be served upon defendant." Panichi later testified that he failed to make any effort to ascertain the address of Otakar, who was then still living in the same apartment on Lake Shore Drive. He never asked Daniella about her address prior to living with her uncle. Daniella also told Panichi that the birth father would never consent to an adoption, whereupon Panichi told her the only other "remedy" would be to find unfitness. Panichi testified: "[Daniella] led us to believe that she was going to be able to control [Otakar] for not coming forward by still secreting the birth and the whereabouts [of the baby]."

When the Does filed their petition for adoption they alleged that "the biological father is unknown" and that "the address of said father is unknown." Subsequently, the Does filed their "Amendment To Supplement Petition For Adoption" wherein they again asserted that the father was unknown and his whereabouts were then unknown. The first petition was personally signed by the Does and the amended

petition was signed by the Doe's attorney, Panichi, on their behalf. At this time, both the Does and their attorney knew this to be untruthful. They had both been told by Daniella that she knew the name of the father and his whereabouts. Hence, the adoption petition filed was fraudulent and illegal and the subsequent adoption decree entered thereon was void. During the initial adoption hearing, prior to Otakar's involvement in the case, Daniella informed the court that she did not know the identity of Baby Richard's father. This was stated in the presence of the Does and their attorney, all of whom knew this to be false.

Daniella's Uncle Joe testified and corroborated the stories of both Daniella and Otakar. Daniella originally lived with him prior to moving out to live with Otakar. Sometime in February 1991, Daniella returned to live with him, during which time she delivered a baby. He knew that the baby was born alive and had not died. He never saw the father, Otakar, inside or outside of his house. After the baby was born, at the request of Daniella, Uncle Joe told Otakar that the baby had died. Otakar left several messages on the answering machine at the uncle's house, but Daniella refused to take Otakar's calls.

The couple's mutual friend, Selva, testified that she worked in the pastry shop at the restaurant complex managed by Otakar and she knew about the baby as well as about the birth arrangements at St. Joseph's Hospital. She did not know that Daniella wanted to put the baby up for adoption. Prior to the birth of the baby, Otakar gave Selva $500 to give to Daniella, but Daniella refused to take it. She did not talk to Daniella again until May 9, 1991, when Daniella came over to Selva's house to tell her the truth about the baby and that she had consented to adoption. Selva then went to Otakar's place of business and told him about the adoption. On May 12, 1991, Daniella moved back to Otakar's apartment and explained to him what had happened with the baby.

## II. FINDINGS OF THE TRIAL COURT

At the close of the adopting parents' case, counsel for Otakar moved for a directed verdict based upon the failure of the Does to present clear and convincing evidence of unfitness by the birth father. He argued that if the failure of a person to show a reasonable degree of interest in the child under the Adoption Act is caused by impediments beyond the person's control, this constitutes an affirmative defense to the charge of "unfitness." The motion was denied.

At the conclusion of all the evidence, the trial judge declared Otakar an "unfit parent" partially based upon the fact that Otakar had

travelled to his homeland for a brief period in January 1991. However, he returned to the United States 1½ months prior to the birth of Baby Richard. The trial judge also found Otakar "unfit" because he should have been seeking legal advice when instead he was trying to make contact with the birth mother. On May 8, 1992, Otakar's parental rights were terminated based upon his unfitness and the adoption decree favoring the Does was entered on May 12, 1992.

The trial judge apparently did not take into consideration the fact that Otakar was hindered from showing an interest in the baby within the first 30 days of birth *as a result of* the scheme propagated by Daniella. Moreover, it should be noted that both the adopting parents, their lawyer and the social worker who arranged this adoption were all aware of Daniella's "plan" to defraud Otakar of his rights to the baby and that she was well aware of his location at all times pending the adoption proceedings. Yet no effort was made by the adopting parents, their attorney or the trial court to locate the biological father in this case. Upon discovering the adoption, Otakar promptly moved within the statutory 30-day period to challenge the adoption and assert his rights as the biological father of the child.

Although Illinois courts have considered the best interests of the child in cases such as this, courts have deferred in the first instance to the relationship between parent and child in both custody and guardianship proceedings. (*In re Custody of Townsend* (1981), 86 Ill. 2d 502, 427 N.E.2d 1231; *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 247 N.E.2d 417.) In *Townsend,* the supreme court required that a third party seeking to obtain custody of a child to demonstrate "good cause or reason to overcome the presumption that a parent has a superior right to custody and further must show that it is in the child's best interests that the third-party be awarded the care, custody and control of the minor." (*Townsend,* 86 Ill. 2d at 510-11, 427 N.E.2d at 1235-36.) The phrase to "demonstrate good cause or reason to overcome the presumption that a parent has a superior right to custody" is legally equivalent to requiring a demonstration that a parent is not "fit." *In re Estate of Brown* (1990), 207 Ill. App. 3d 139, 144, 565 N.E.2d 312.

While it is true, as the majority argues, that the "superior rights doctrine" is an archaic rule of law emanating from a societal view of children as chattel, this doctrine has not been completely obliterated by the "best interests standard" promulgated by the majority. Instead, the presumption favoring biological parents is to be considered in light of *all relevant factors* in determining what is in the best interests of the child. In other words, a natural parent may be required to

yield custody rights only where the best interests of the child would be served. (*Townsend*, 86 Ill. 2d at 508-09, 427 N.E.2d at 1234-35; *Livingston*, 42 Ill. 2d at 208-10, 247 N.E.2d at 421-22; see also *In re Estate of Becton* (1985), 130 Ill. App. 3d 763, 474 N.E.2d 1318.) In *Becton*, the court held that the third-party must establish good cause or reason to overcome the presumption in favor of the natural parents. Among the factors courts should consider are: the sufficiency of the parent's home, its surroundings, the attachment of the child to a third party and the happiness, security and comfort of the child. *In re Custody of Henkins* (1983), 117 Ill. App. 3d 666, 453 N.E.2d 78.

The majority cites *In re Ashley K.* (1991), 212 Ill. App. 3d 849, 879, 571 N.E.2d 905, in support of its "best interests analysis" wherein Justice Rizzi wrote for the majority:

"A child's best interest is not part of an equation. It is not to be balanced against any other interest. In custody cases, a child's best interest is and must remain inviolate and impregnable from all other factors, including the interests of the biological parents." *Ashley K.*, 212 Ill. App. 3d at 879, 571 N.E.2d at 923.

It is interesting to note that in the earlier case of *Montgomery v. Roudez* (1987), 156 Ill. App. 3d 262, 509 N.E.2d 499, Justice Rizzi wrote:

"*[A] finding of unfitness cannot be based solely on a lack of continuous contact between a parent and her child.* Moreover, we have examined the interaction between plaintiff and [her child] and find nothing in the record to support a finding of parental unfitness on plaintiff's part. Clearly, a parent is not unfit in the usual sense of the word because she has faults or would be found lacking as an ideal parent.

\*\*\* Fitness of a parent is only one of the factors to be considered in determining how the best interests of a child will be served. \*\*\*

Plaintiff also argues that her superior right to custody of [her child] was not overcome by any good cause or reason sufficient to require an award of custody [to a third-party non-parent.]" (Emphasis added.) *Montgomery*, 156 Ill. App. 3d at 266-67, 509, 509 N.E.2d at 502.

Justice Rizzi further explained that there are "many factors" to be considered in determining which custodial arrangement will best serve the interests of the child, including: (1) the wishes of the child; (2) the sufficiency and stability of the respective homes and surroundings of the parties; (3) the interaction and relationship between the

parent and child; (4) the child's adjustment to his home; and (5) the mental and physical health of the parties involved. *Montgomery*, 156 Ill. App. 3d at 267, 509 N.E.2d at 503.

I initially note that the case of *Ashley K.*, relied upon by the majority, interestingly enough involved a set of natural parents, both of whom were proven drug addicts, the biological mother was a known prostitute and Ashley was removed from their care due to proven neglect. Thus, *Ashley K.* is clearly distinguishable on its facts from the case *sub judice*. Secondly, in the instant case, there was no evidence presented to the trial court on the adoptive parents, in order to provide for a proper "best interests" analysis. The only evidence in the record indicating the "fitness" of the Does is that they defrauded the court by knowingly acceding to an adoption where they knew the natural father had been deprived of any rights. It is interesting to note that in the majority opinion Justice Rizzi has failed to apply the multifactor balancing test indigenous to a best interests analysis. To do so would be to admit that a best interests analysis was never performed by the trial court in this case. Moreover, in their appellate briefs and during oral argument before this court, no evidence was presented by counsel for either party regarding the best interests of Baby Richard.

The entire finding of unfitness in this instance rests upon the trial judge's finding that Otakar should have contacted a lawyer within 30 days of the due date instead of trying to make contact with the birth mother and searching through her garbage for evidence that the child was in fact alive. As Justice Rizzi stated in *Montgomery* (156 Ill. App. 3d at 266): *"[A] finding of unfitness cannot be based solely on a lack of continuous contact between a parent and her child."* (Emphasis added.) Nevertheless, the entire majority decision rests upon the fact that the biological parents have had no contact with Baby Richard since his birth. This must be the case since no evidentiary hearing was held on the many factors which may affect the best interests of Richard. Nothing in the record reflects the current care and security of Richard, the background of the Does or even the long-term and latent psychological effects on Baby Richard when he realizes the course of events which led to the termination of his natural father's parental rights.

In addition to State-created rights, there are certain constitutional safeguards relating to the family. The Supreme Court first extended constitutional protection to the parent-child relationship in 1923 when it explained that although no exact definition of the liberty guaranteed by the fourteenth amendment existed, "[w]ithout doubt it denotes *** the right of the individual to contract, to engage in any of

the common occupations of life, to acquire useful knowledge, to marry, establish a home *and bring up children.*" (Emphasis added.) (*Meyer v. Nebraska* (1923), 262 U.S. 390, 399, 67 L. Ed. 1042, 1045, 43 S. Ct. 625, 442.) In 1944, the Court recognized that society has an interest in protecting the welfare of all children: "[i]t is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed men and citizens." (*Prince v. Massachusetts* (1944), 321 U.S. 158, 165, 88 L. Ed. 645, 652, 64 S. Ct. 438, 442.) Finally, in 1974, the Supreme Court held: "[t]his Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." (*Cleveland Board of Education v. LaFleur* (1974), 414 U.S. 632, 639-40, 39 L. Ed. 2d 52, 60, 94 S. Ct. 791, 796.) Although the Court has never addressed third-party custody disputes directly, *Carey v. Population Services International* (1977), 431 U.S. 678, 52 L. Ed. 2d 675, 97 S. Ct. 2010, extended the right of privacy to include the use of contraception to all persons, married or unmarried, since individuals have *a fundamental right in deciding to bear and beget a child.* The Court also accorded great deference to the parent-child relationship in *Parham v. J.R.* (1979), 442 U.S. 584, 61 L. Ed. 2d 101, 99 S. Ct. 2493.

Many other jurisdictions have rendered decisions purely on the basis of biological relations. (See *Roche v. Roche* (1944), 25 Cal. 2d 141, 144, 152 P.2d 999, 1000 ("One of the natural rights incident to parenthood *** is the right to care and custody of a minor child"); *In re J.C.P.* (1983), 167 Ga. App. 572, 307 S.E.2d 1 (Only where compelling circumstances are found to exist by clear and convincing proof may a court sever the child-parent custodial relationship).) At least seven States clearly apply a parental rights standard to third-party custody disputes. See *In re Guardianship of D.A. McW.* (Fla. 1984), 460 So. 2d 368; *Blackburn v. Blackburn* (1982), 249 Ga. 689, 292 S.E.2d 821; *McGregor v. Phillips* (1975), 96 Idaho 779, 537 P.2d 59; *Sheppard v. Sheppard* (1981), 230 Kan. 146, 630 P.2d 1121; *Pierce v. Pierce* (1982), 198 Mont. 255, 645 P.2d 1353; *In re Grover* (Okla. 1984), 681 P.2d 81; *Cyphers v. Cyphers* (1983), 172 W. Va. 280, 304 S.E.2d 866.

In the recent Michigan decision of *In re Clausen* (Mich. Sup. Ct.), Nos. 96366, 96441, 96531, 96532 (filed July 2, 1993), which has become a *cause celebre*, the biological mother incorrectly listed the wrong father's name during the adoption proceedings. While the adoption was pending the true biological father was discovered and proven through blood tests. The father then promptly moved to invali-

date the adoption. Following a bench trial, the Iowa district court found that the father had established by a preponderance of the evidence that he was the biological father, that the adopting parents had failed to establish by clear and convincing evidence that he had abandoned the child or that his rights had been terminated and that a "best interests" analysis was not appropriate since abandonment was not established. The Michigan Supreme Court later affirmed the decision and the baby, Jessica, was returned to her biological parents. At the end of the proceedings, Jessica was 2½ years of age.

Similarly, in the instant case, the father, Otakar, was unaware of the birth of his child until more than 30 days after his birth. It must be reiterated that the adopting parents and their attorney knew that the father could be located, but no attempt was made to do so. Moreover, Daniella told their lawyer of her plans to tell Otakar that the baby had died. While we should not totally discount the best interests of the child in this case, we cannot ignore the gross injustice perpetrated upon the biological father in this instance. This is not a case of a disinterested father or a man intending to leave his girl friend "in the lurch." He lived with and cared for Daniella throughout her pregnancy, paying for all rent, food and medical necessities. He also made delivery arrangements for Baby Richard. It was only as a result of the meddling of Otakar's relatives that the relationship between the biological parents became severed. Daniella decisively and improvidently reacted to the hearsay information that Otakar was seeing his former girl friend. It has been medically proven that women often react in an unusually emotional and volatile manner even to ordinary everyday occurrences during prenatal and post-natal care, much less such a severe blow dealt to her in her eighth month of pregnancy. There is no evidence in the record that the information given to Daniella was even remotely true and it seems extremely doubtful given their subsequent reconciliation.

The interests of the child are but one factor to be considered in a case of such a delicate nature. We must consider the effect on the child who will one day learn that his biological father was defrauded and prevented of any opportunity to win his custody in a scheme which involved the adopting parents and their attorney, not just the biological mother. Moreover, during the initial adoption hearing, the trial court did not require any proof of the biological father or his whereabouts. If there is no law requiring such an investigation, then the law must be changed. The potential damage of allowing the birth mother to solely control the termination of parental rights is immeasurable and the social costs too great. Even the biological mother her-

self is a sorry victim in this case. Her actions were entirely instigated by the interference of Otakar's relatives and a vicious unproven rumor which called into question her future relationship with Otakar and her prospective ability to care for the baby as a single mother and as a new immigrant in a foreign culture. This is not the case of a biological mother who had numerous bedfellows, hindering proper identification of the father, as was the case in *In re Clausen*.

The statutory language cited by the majority regarding a disposition hearing within 18 months of a custody transfer may prove adequate for certain foster care situations, but it is not really sufficient to remedy the tragedy of this case and the many others which may follow. The laws regarding parental termination based upon a finding of unfitness or abandonment within the first 30 days of birth were originally written to protect women at a time in our history when single mothers were deserted or abandoned after impregnation and out of a lack of economic resources and societal taboos were forced to sign away their parental rights to a "proper family." We are now living, for better or for worse, in an era where many women are choosing single motherhood and either deserting the natural father or abrogating any rights of the father by signing adoption consents or raising the child without ever informing the father of his legal status. This presents a potentially tragic situation for the unknowing natural father as well as any future adoptive parents, not to mention the child who is forever affected by this imbroglio, regardless of the outcome.

The majority consoles itself with the demise of the *Dred Scott* decision and the passing of an era when children were treated as chattel. Yet the fervent cries of all parties involved—"This is my child! Hew it in half if you must, but give me my share!"—strongly suggest that children are still being treated as chattel. Only the legal rhetoric has changed, as per the majority viewpoint in this case.

First and foremost, laws are needed mandating a good-faith investigation into the identity and location of the biological father prior to the finalization of any adoption. Severe sanctions should be imposed upon parties and their counsel for concealing information regarding the whereabouts of the natural father. Secondly, the time period within which the natural father may assert his rights must be limited to a fixed period of time, for example, no more than 30 days from the birth of the child, unless he possesses an affirmative defense, but in no case should this period be extended beyond 120 days. Finally, any assertion of parental rights within this time period should mandate an emergency hearing on the best interests of the child's disposition which would encompass the rights of the bio-

logical parent who had not terminated his parental rights. Within 30 days of this hearing, an expedited appeal should be filed and scheduled for immediate hearing and an expedited ruling. The entire process should take no more than six months, unlike the instant case, where the process took 2½ years. If this had been the law, we would now be deciding the fate of a six-month-old infant and not that of a 2½-year-old toddler.[6]

The natural father in this case did what a reasonable man could be expected to do within the first 30 days of Baby Richard's life. Through the entire pre- and post-natal period, he held himself out as the father of Baby Richard, he never abandoned the baby and he even begged Daniella's uncle for information about the baby, culminating in his desperate search through garbage cans for discarded diapers or formula. One can visualize the pain and anguish this father was experiencing. One would not expect him to immediately run to an attorney at this point, when he had still hoped for an amicable reunion with Daniella. We have here two young people from a foreign country thrust into a situation where they were in love, but due to the interference of family and "well-meaning" social agencies, they end up losing legal right to their child.

We are so overwrought by "pop culture" values in our society that we can allow, without hesitating, the concept now being promulgated, without a loud cry of "Something is wrong here." This child should be reunited with his biological parents. The mishmash that society has somehow created in the year 1993 goes against core Judeo-Christian principles, which for thousands of years have supported the family unit above all else. Moreover, this concept is universal and transcends all national, ethnic and religious lines.[7] We are now elevating social workers, attorneys and media reaction above familial rights to determine the best interests of children.

---

[6]When no one person has cared for an infant for more than a few months, the child should not yet have developed a dependency on any one person at the time of placement. Thus, placing the infant in a new setting should not have an adverse impact on him. See J. Bowlby, Attachment and Loss 222, 223, 228 (1969); R. Patton, Growth Failure in Maternal Deprivation 38 (1963).

[7]"When the family is ruined, the timeless laws of family duty perish; and when duty is lost, chaos overwhelms the family ***.

The sins of men who violate the family create disorder in society that undermines the constant laws of *** family duty.

***[W]e have heard that a place in hell is reserved for men who undermine family duties." *Bhagavad-Gita* 10:40, 10:43, 10:44 (Hindu scriptures, 1st century, A.D.).

Hypothetically, what happens if the adoptive family unit fails? What if the Does subsequently divorce? What if the adopting couple experiences emotional and physical crises? Will there come a time when Richard will discover his biological parents fought for his return for the first 2½ years of his life?

If there is a voice in the wilderness crying out, it is the voice of law and reason. Our society has been founded on the concepts of family and freedom under the law for all. Without families and without biological parents, society must fail. There exists no stronger tie than the blending of two human beings, resulting in the creation of another human life. Obviously, there are thousands of unfit biological parents who ought not raise children. The tragic case of Baby Jessica in Michigan may be one such example. Where was the caring biological father in the *Clausen* case? In that instance, the court refused to apply a best interests analysis because it found that the biological father had never abandoned his child. As a result, two loving, adoptive parents have been destroyed. I am not suggesting that this should be the law in Illinois. I agree with the majority that the best interests of the baby must prevail, but only after a hearing of all evidence relevant to the child's future welfare. In this case, no such analysis was ever performed by the trial court. On appeal, the majority has created its own best interests analysis, and based upon the evidence presented in the record, the majority has reached an erroneous result.

Unlike the Baby Jessica case, this case involves two loving biological parents who remained together except for the brief period of time when Daniella became confused about her relationship. It was during this period that she signed her baby away. Otakar's rights were never protected. He never left her. He provided for her support throughout the pregnancy and even tried to send her money through an intermediary. He pled with her uncle to speak with Daniella and even searched through garbage cans for evidence of the child. He did everything a reasonable person could have done except obtain the services of an attorney. However, within the first 30 days of Baby Richard's life, Otakar did not know the adoption process had commenced. The attorney for the Does could have easily ascertained the whereabouts of Otakar and yet he filed an adoption petition alleging that the biological father was "unknown." In so doing, the Does and their attorney filed a patently false document. A judgment for adoption cannot be entered on the basis of a false or fraudulent petition. Hence, this case warrants an outright reversal of the trial court's ruling, but at the very least, it should be re-

manded for a hearing and presentation of expert testimony in order to determine the best interests of Baby Richard.

The majority's concern with the separation of Baby Richard from his adoptive parents is understandable, but an abrupt termination of the Does' custody rights is not the only available remedy. Obviously, Baby Richard has formed "affection relations" or a "psychological relationship" with his adoptive parents. However, researchers have found that a child may enjoy more than one affection relationship.[8] A child applies what he or she has gained from the first affection relationship to later relationships with other individuals who give the child a similar amount of love, affection and attention. The affection relationship is not the sole province of the psychological parent. Other persons who offer emotional support to the child can equally form an affection relation with him. In addition, the order reversing an adoption, in a case such as this, could provide visitation rights to the adoptive parents for a limited period of time, in order to reduce the risk of psychological trauma caused by an abrupt severance and to help the child adjust to his new surroundings.[9]

There is no doubt that the rights of the biological parents were improperly obliterated by the lower court. The charade of terming the father "unfit" because he failed to immediately seek legal advice is preposterous and an insidious appendix to the already confused state of the law in such cases. If the biological father did not know when or where the child was born, when did the 30-day period for measuring fitness begin to run? If Otakar was informed the child had died, then the 30-day period could not have begun until May 12, almost two months after the baby's birth, when Daniella informed Otakar of the adoption. Until this point, there existed an impediment to Otakar exhibiting a reasonable degree of interest in Baby Richard. A proper application of the law would have recognized this impediment as an affirmative defense, based upon the

---

[8] See Note, *Adoption—Psychological v. Biological Parenthood in Determining the Best Interest of the Child*, 3 Seton Hall L. Rev. 130, 140 (1971).

[9] It is quite difficult and often ill-advised for the new family to deny the existence of the child's previous family. Post-judgment visitation by the adoptive parents could facilitate the child's development and integration into his "new" family. Of course, the court would have to consider all relevant factors in determining if post-judgment visitation would be in the best interests of the child and, if so, it would establish an appropriate visitation scheme. See Note, *Visitation After Adoption: In the Best Interests of the Child*, 59 N.Y.U. L. Rev. 633 (1984).

unique facts of this case. Based upon all of the foregoing, this adoption was improper, illegal and fraudulent and it should be vacated by this court.

Finally, if the majority wishes to solely base its opinion upon the "best interests" of the child then at the very least a "best interests" hearing should be held in order to consider all factors affecting the child's future welfare, including: (1) the wishes of the child; (2) the sufficiency and stability of the respective homes and surroundings of the parties; (3) the interaction and relationship between the parent and child; (4) the child's adjustment to his present home; (5) the mental and physical health of the parties involved. In addition, in this case, the "best interests" analysis must also weigh the apparent fraud of the adopting parents and their attorney; the volatile emotional state of the biological mother at the time of her initial consent to the adoption; and the apparent legitimate concern of the biological father, whose parental rights were terminated due to a finding of "unfitness." No evidence was presented to the trial court or to this court specifically concerning the best interests of Baby Richard. In any case, the best interests view adopted by this court must not be construed to lessen the vitality, integrity or stability of the biological family unit.

It is interesting that the majority, without blinking, has deemed itself all-knowing in this instance and has assumed a sacrosanct role formerly reserved for Divine Providence. The tradition of adoption in our society was created in order to provide a place of love and care for abandoned, unwanted and orphaned children. Baby Richard was never abandoned or unwanted. American society should not be so devoid of humanity, fairness and just plain good common sense.

For all of the aforementioned reasons, I respectfully dissent from the majority view.